**DUNLOP HOLDINGS LIMITED,**
Plaintiff-Appellant,

v.

**RAM GOLF CORPORATION,**
Defendant-Appellee.

No. 74–2024.

United States Court of Appeals,
Seventh Circuit.

Argued April 14, 1975.

Decided Oct. 20, 1975.
Certiorari Denied March 8, 1976.
See 96 S.Ct. 1435.

Ellsworth H. Mosher, Arlington, Va., Robert D. Weist, Chicago, Ill., for plaintiff-appellant.

Theodore R. Scott, Chicago, Ill., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, and STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff sued Ram for infringement of its patent covering an unusually durable golf ball.[1] Ram convinced the district court that the patent was invalid because the invention had been made by a third party named "Butch" Wagner. Ram proved that Wagner had publicly used the new golf ball before February 10, 1965, the earliest date that plaintiff can claim invention;[2] however, Wagner had not disclosed his formula to the public. The questions on appeal are (1) whether the district court's findings on the prior invention issue are supported by the record, and (2) whether the non-disclosure of the method of making an article which is in public use is the kind of concealment or suppression that avoids the bar to patentability in § 102(g).[3]

The patent covers the discovery that certain synthetic materials,[4] when fabricated by themselves (or with minor amounts of compatible materials), produce a golf ball cover with exceptional cutting resistance. An example of the material described in the patent is a duPont product named "Surlyn." Golf balls made of Surlyn, with or without minor additives, infringe the claims in plaintiff's patent.

As noted, the date of invention claimed by plaintiff is February 10, 1965. In April of 1964, duPont was trying to find a commercial use for its Surlyn, a recently developed product. Shortly thereafter, Butch Wagner, who was in the business of selling re-covered golf balls, began to experiment with Surlyn as a golf ball cover. He first made some sample balls by hand and then, using a one-iron, determined that the material was almost impossible to cut. He obtained more Surlyn and made several dozen experimental balls, trying different combinations of additives to achieve the proper weight, color, and a texture

---

1. U. S. Patent No. 3,454,280 covering "Golf Balls Having Covers of Ethylene—Unsaturated Monocarboxylic Acid Copolymer Compositions," issued to Dunlop Rubber Company Limited, a British company, as the assignee of the two individual inventors, pursuant to a U.S. Patent Application filed February 2, 1966, and a British application filed on February 10, 1965.

2. 35 U.S.C. § 104 provides in part that " . . an applicant for a patent, or a patentee, may not establish a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country, except as provided in section 119 of this title." 35 U.S.C. § 119 allows priority from the date of filing in certain foreign countries including Great Britain. Plaintiff is thus barred from establishing a date of invention by reference to its activities in Britain prior to February 10, 1965, the date of its British application.

3. 35 U.S.C. § 102 provides:

    "A person shall be entitled to a patent unless—

    *    *    *    *    *    *

    "(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . . "

4. The parties use the term "copolymers" which we understand to refer to a kind of synthetic rubber or plastic material. The description in the patent is of

    "A golf ball comprising a core and a cover, said cover being formed of a composition comprising a copolymer of ethylene and at least one unsaturated monocarboxylic acid containing from three to eight carbon atoms, said copolymer containing up to thirty percent by weight of said acid." Patent No. 3,454,280 column 6, lines 45–50.

that could easily be released from an injection molding machine. By November 5, 1964, he had developed a formula which he considered suitable for commercial production and had decided to sell Surlyn covered balls in large quantities. The date is established by a memorandum recording his formula, which Wagner wrote in his own hand and gave to his daughter for safekeeping on the occasion of her son's birthday.[5]

■ During the fall of 1964, Wagner provided friends and potential customers with Surlyn covered golf balls. By the end of the year he had purchased enough Surlyn to produce more than 20,000 balls, and by February of 1965 he had received orders for over 1,000 dozen Surlyn covered balls. By the end of 1965, he had ordered enough Surlyn to produce more than 900,000 such balls. Without commenting further on the evidence, we note our conclusion that there is ample support in the record for the district court's findings that Wagner had discovered the use of Surlyn as a golf ball cover before November 5, 1964, had reduced the discovery to practice before February of 1965, and did not abandon the invention before his death in October of 1965.

■ We recognize that Wagner continued to experiment with different formulae after his decision to go into commercial production and that he encountered some problems with cracked covers. These facts do not undermine any of the district court's findings on the prior invention issue. The patent claims are broad enough to encompass any golf ball cover made principally of Surlyn, and there is no doubt that Wagner had made a large number of such golf balls and successfully placed them in public use.[6] The only novel feature of this case arises from the fact that Wagner was careful not to disclose to the public the ingredient that made his golf ball so tough.[7] For that reason plaintiff argues that he "suppressed or concealed" the invention within the meaning of § 102(g).

Since 1850 it has been settled that a patentee may be entitled to credit for making a new discovery or invention even though someone else actually made the discovery before he did. *Gayler v. Wilder,* 10 How. 509, 51 U.S. 477, 13 L.Ed. 504. That case established the proposition that an abandoned invention will not defeat the patentability of the rediscovery of "lost art."[8] The case has

---

5. In the district court's original findings this handwritten memorandum was erroneously described as a page in Wagner's formula book, whereas it was actually a separate sheet of paper. We attach no significance to this error, which the district judge subsequently corrected, since the testimony unequivocally established the genuineness of the document. We also find no substance in appellant's objection to the district court's making this minor correction in its findings after the notice of appeal was filed. See Fed.R.Civ.P. 60(a).

6. The evidence identifies at least three golfers who used Surlyn covered balls during the fall of 1964 for rounds of golf played at Riveria Country Club in Los Angeles. (Tr. 366–377; Fredericks Deposition, pp. 4–9; Keller Deposition, pp. 5–11) By February, 1965, two of these golfers, both of whom were favorably impressed with the play of the new ball, had placed orders with Wagner for more than 1000 dozen Surlyn covered balls; they began to distribute them commercially although they both lacked knowledge of the Surlyn content in the

cover construction. (Tr. 365–377; Keller Deposition, pp. 5–11; DX 7, 8, 13, and 24–27.)

7. In support of its contention that Wagner concealed his invention plaintiff relies on (1) the deposition of an acknowledged expert on golf ball construction who failed to discover the Surlyn content of the cover in an analysis of Wagner's ball; and (2) the secretive manner in which Wagner gave the Surlyn formula to his daughter on her son's birthday "to keep in case something ever happened to him." (Brickner Deposition, Vol. II, pp. 106–107.)

8. "So, too, as to the lost arts. It is well known that centuries ago discoveries were made in certain arts the fruits of which have come down to us, but the means by which the work was accomplished are at this day unknown. The knowledge has been lost for ages. Yet it would hardly be doubted, if any one now discovered an art thus lost, and it was a useful improvement, that, upon a fair construction of the act of Congress, he would be entitled to a patent. Yet he would not literally be the first and original inven-

also been cited for the proposition that an inventor who had merely made a secret use of his discovery should not be regarded as the first inventor. *Gillman v. Stern,* 114 F.2d 28, 31 (2d Cir. 1940).

*Gillman* involved a patent on a machine which had previously been developed by a man named Haas; Haas had used the machine in his own factory under tight security. The output from the machine had been sold, but the public had not been given access to the machine itself. In holding that Haas was not the first inventor, Judge Hand drew a distinction between a secret use and a noninforming public use.[9] There had been only a secret use of the Haas machine and therefore he was not regarded as the first inventor.

■ This case certainly involves neither abandonment nor a mere secret use. For the evidence clearly demonstrates that Wagner endeavored to market his golf balls as promptly and effectively as possible. The balls themselves were in wide public use. Therefore, at best, the evidence establishes a noninforming public use of the subject matter of the invention.

■ If Wagner had applied for a patent more than a year after commencing the public distribution of Surlyn covered golf balls, his application would have been barred notwithstanding the noninforming character of the public use or sale. *Egbert v. Lippmann,* 104 U.S. 333, 336, 26 L.Ed. 755;[10] *Magnetics, Inc. v. Arnold Engineering Co.,* 438 F.2d 72, 74 (7th Cir. 1971). For an inventor must exercise reasonable diligence if he is to be rewarded with patent protection.[11]

The question of diligence is especially significant in cases arising out of a dispute between two applicants for a patent on the same discovery. For in such a case, when the issue is which of the two applicants is entitled to the monopoly reward, it is often appropriate to weigh the later inventor's diligence in enabling the public to obtain the benefit of the concept more heavily than the earlier date of unexploited conception. *Cf. Mason v. Hepburn,* 13 App.D.C. 86, 91 (1898). But in this case, although Wagner may have failed to act diligently to establish his own right to a patent, there was no lack of diligence in his attempt to make the benefits of his discovery available to the public. In view of his public use of the invention, albeit

tor. But he would be the first to confer on the public the benefit of the invention. He would discover what is unknown, and communicate knowledge which the public had not the means of obtaining without his invention." 51 U.S. at 497.

See *Marconi Wireless Co. v. United States,* 320 U.S. 1, 35, 63 S.Ct. 1393, 87 L.Ed. 1731.

9. "We are to distinguish between a public user which does not inform the art (*Hall v. Macneale,* 107 U.S. 90, 97, 2 S.Ct. 73, 27 L.Ed. 367) and a secret user; . . . ." 114 F.2d at 31.

10. "An invention may consist of a lever or spring, hidden in the running gear of a watch, or of a rachet, shaft, or cog-wheel covered from view in the recesses of a machine for spinning or weaving. Nevertheless, if its inventor sells a machine of which his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one."

11. The second sentence of § 102(g) reads as follows:

"In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

A conclusion that Wagner had concealed or suppressed his invention would have to be supported by a stronger showing than a mere lack of diligence. For it is less serious to hold that the first inventor has forfeited his right to a patent monopoly than it is to hold that he has forfeited any right to use his own invention without the permission of a subsequent inventor.

"But we must bear in mind that it was not alone to reward the inventor that the patent monopoly was granted. The public was to get its reward and have the advantage of the inventor's discovery as early as was reasonably possible. See Robinson on Patents, § 385." *Hull v. Davenport,* 90 F.2d 103, 105 (C.C.P.A.1937).

noninforming, we do not believe he concealed or suppressed the discovery within the meaning of § 102(g).

We recognize, as appellant argues, that portions of Judge Rich's opinion in *Palmer v. Dudzik,* 481 F.2d 1377 (C.C.P. A.1973), suggest that a public use which does not disclose the inventive concept may amount to concealment within § 102(g). But that case, like *Gillman,* involved a patent on a machine; the benefits of using the machine were not made available to anyone except the inventor. Moreover, the case arose out of an interference proceeding in which the dispute was between two applicants for a patent, the earlier of the two having been less diligent than the later. In this case, Wagner was not only the first inventor, but also "the first to confer on the public the benefit of the invention," *Gayler v. Wilder,* 51 U.S. at 497.

■ There are three reasons why it is appropriate to conclude that a public use of an invention forecloses a finding of suppression or concealment even though the use does not disclose the discovery. First, even such a use gives the public the benefit of the invention. If the new idea is permitted to have its impact in the marketplace, and thus to "promote the Progress of Science and useful Arts," [12] it surely has not been suppressed in an economic sense. Second, even though there may be no explicit disclosure of the inventive concept, when the article itself is freely accessible to the public at large, it is fair to presume that its secret will be uncovered by potential competitors long before the time when a patent would have expired if the inventor had made a timely application and disclosure to the Patent Office.[13] Third, the inventor is under no duty to apply for a patent; he is free to contribute his idea to the public, either voluntarily by an express disclosure, or involuntarily by a noninforming public use.

12. U.S.Const., art. I, § 8, clause 8.

13. In this case, for example, it is not unreasonable to assume that competing manufacturers of golf balls in search of a tough new material to be used as a cover, might make inquiries of

In either case, although he may forfeit his entitlement to monopoly protection, it would be unjust to hold that such an election should impair his right to continue diligent efforts to market the product of his own invention.

 We hold that the public use of Wagner's golf balls forecloses a finding of suppression or concealment; that holding is consistent with both the decided cases and the underlying purposes of the statute.

Affirmed.

Wagner's Surlyn supplier that would soon reveal his secret ingredient. After all, duPont certainly had a motive to expand the market for Surlyn.