**CTS CORPORATION,**
**Plaintiff-Appellee,**

v.

**PIHER INTERNATIONAL CORPORATION and Piher Sociedad Anonima,**
**Defendants-Appellants.**

**No. 75–1100.**

United States Court of Appeals,
Seventh Circuit.

Argued June 11, 1975.

Decided Dec. 17, 1975.
Rehearing Denied Jan. 26, 1976.
Certiorari Denied March 22, 1976.
See 96 S.Ct. 1485.

Edwin M. Luedeka, Raiford A. Blackstone, Jr., and Robert B. Jones, Chicago, Ill., for Piher.

Walther E. Wyss, Robert L. Rohrback, Chicago, Ill., John J. Gaydos, Elkhart, Ind., for CTS Corp.

Before CLARK, Associate Justice (Retired)*, STEVENS, Circuit Judge, and GRANT, Senior District Judge.**

STEVENS, Circuit Judge.

Appellants contend that the district court erroneously rejected their attacks on the validity of the '604[1] and '285[2] patents on variable resistance controls and erroneously found that their "PT–15" trimmer infringed the former patent. The '604 patent discloses a flared bearing used as a dust excluding seal of an aperture in the housing enclosing the control. The '285 patent describes a mechanical assembly which uses a metallic collector—an essential component of the control—as the base of the housing.

The principal issues on appeal are (1) whether one of appellee's earlier patents ('478)[3], which disclosed the use of a flared bearing to hold the components of the control together, made the '604 improvement obvious; (2) whether the failure to cite '478 to the Patent Office during the processing of the '604 application breached appellee's duty of disclosure; (3) whether reversal of the finding that the '604 patent has been infringed is required by either (a) the fact that appellants' PT–15 trimmer (which apparently is similar to appellee's '285 device) uses a metallic collector as a base, whereas the device described in the '604 specifications uses a nonconductor and admittedly would not function with a metal base, or (b) the fact that the PT–15 trimmer uses a flared bearing to seal only one of two openings in its housing; (4) whether the erroneous exclusion of critical evidence frustrated the presentation of a meritorious "on sale" challenge to the validity of the '285 patent;[4] and (5) whether appellee's development of the '285 device was so abortive that either (a) it was not "useful" within the meaning of § 101;[5] or (b) the patent specifications failed to describe "the best mode" of carrying out the invention as required by § 112;[6] or (c) the invention was "abandoned" within the meaning of § 102(c).[7] We shall briefly describe the product, the parties, and the posture of the case, and then discuss the facts in greater detail in connection with our consideration of the several issues.

A variable resistor—sometimes called a "potentiometer" or a "trimmer"—is used to adjust the electrical resistance of an electronic circuit to a desired level. The volume and tone controls on a television or radio set are examples of variable resistors. The essential elements of such a control include (1) a *driver*, or shaft, which may be turned manually or

---

\* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

\*\* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. Patent No. 3,518,604 on "Electrical Component" issued to appellee as assignee of Beaver and Van Benthuysen on June 30, 1970, pursuant to application filed February 12, 1968.

2. Patent No. 3,670,285 on "Variable Resistance Control With End Collector" issued to appellee as assignee of English on June 13, 1972, pursuant to application filed March 16, 1970.

3. Patent No. 3,375,478 on "Electrical Control And Method of Making the Same" issued to appellee as assignee of Van Benthuysen and Barden on March 26, 1968, pursuant to application filed May 11, 1964.

4. 35 U.S.C. § 102(b) provides that a person shall be entitled to a patent unless the invention was ". . . on sale in this country, more than one year prior to the date of the application for patent in the United States . . . . ."

5. 35 U.S.C. § 101 provides that one who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

6. 35 U.S.C. § 112 provides, in part:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

7. 35 U.S.C. § 102(c) provides that a person shall be entitled to a patent unless "he has abandoned the invention, . . . . ."

with a tool, such as a screwdriver; (2) a *contactor,* which is affixed to, and may be rotated by, the driver, and which makes electrical contact between the collector and the resistance element; (3) the *collector,* which must be a conductor of electrical current and is installed in a fixed position; and (4) the *resistance element,* which may be a horseshoe shaped sliver of carbon affording varying degrees of electrical resistance, depending upon the location of the contactor which may be swept from one end of the resistance element to the other by turning the driver. These elements may be arranged in a variety of configurations and sizes; in some designs they are enclosed within a dust excluding housing. The patents in suit relate to the mechanical structure rather than the electrical technology of the controls.

The parties are competitors in the manufacture and sale of electrical components for television sets. The appellants are a Spanish manufacturing corporation [8] and its affiliated American distributor,[9] which the district court found to be the "alter ego" of its parent. Since that finding is not challenged, we shall refer to the two simply as "Piher." Appellee ("CTS"), an Indiana corporation,[10] originally accused Piher of infringing four of its patents.[11] Since one of these has now expired, and since only minimal damages are recoverable as a result of infringement of the second, Piher has not appealed from the holding that those two patents were valid and infringed. Moreover, by stipulation the parties withdrew the question whether Piher's PT–15 trimmer infringes the '285 patent, as well as the question of priority of invention of what we infer to be essentially the same disclosure in the CTS '285 patent and in Piher's Spanish patent describing the PT–15 trimmer;

that priority issue is the subject of an interference proceeding pending in the Patent Office. Specific attacks on the validity of the '285 patent were, however, raised by Piher's counterclaim and decided by the district court. The issues on appeal, therefore, involve the validity of '604 and '285 and infringement of '604. We turn to those issues.

I.

The specifications in the '604 patent describe a variable resistor which is completely enclosed in a tiny boxlike plastic housing containing one round opening through which a plastic driver or shaft projects. That projection of the shaft is in the form of a barrel which includes a flared bearing extending outwardly from the periphery of the opening. The bearing fits against the surface of the housing with sufficient firmness to hold the components of the device securely together and yet be smoothly rotatable; it also performs the function of preventing dust or other foreign matter from entering the component.

Piher argues that the '604 improvement was obvious because (a) with one exception, the general arrangement of its components within a dust excluding housing was disclosed by Barden–'140,[12] and (b) that one exception, namely the flared bearing, was disclosed by appellee's '478 patent. We agree with Piher's premises but not with its conclusion.

In Barden–'140 the sealing function was performed by a thrust washer encircling the driver just inside the opening in the housing. Both the '478 patent and the '604 patent describe unsatisfactory characteristics of such a washer and disclose a construction which substitutes a flared bearing—i. e., an enlargement of a portion of the driver—for the wash-

---

8. Piher Sociedad Anonima.

9. Piher International Corporation, an Illinois corporation with offices in Park Ridge, Illinois.

10. CTS Corporation has its principal place of business in Elkhart, Indiana.

11. The '604, '285, and '478 patents identified in notes 1, 2, and 3, and an earlier patent, No. 2,740,027, which has since expired.

12. Patent No. 3,237,140 on "Variable Resistance Control" issued on February 22, 1966, to CTS as assignee of Barden and Snyder pursuant to application filed on May 20, 1963.

er. That substitution having been disclosed by '478, Piher argues that the same substitution disclosed in '604 must surely be classified as obvious.

If the flared bearing in '604 merely performed the function of maintaining a secure relationship among the components during adjustment, Piher's argument would be valid. But in '604 the flared bearing is designed to perform the additional dust excluding function, a function not even arguably performed by its antecedent in '478.[13] Indeed, since the '478 device is not enclosed in a housing, that patent does not concern itself with the use of any sealing member, and therefore neither implicitly nor explicitly suggests that the enlarged portion of the shaft may be used to perform a sealing function.

Although each of the elements of the '604 combination was disclosed by either Barden–'140 or by the '478 patent, the fact that the flared bearing would successfully perform a sealing function was disclosed by neither. According to expert testimony which the trial judge credited, that fact was not obvious to persons skilled in the art when the invention was made. Since the sealing function of the bearing in the '604 device was of critical importance in the Examiner's decision to allow the claims,[14] and since his decision is presumptively correct, the nonobviousness of that application of a flared bearing in a variable resistance control justifies the district court's conclusion that the concept was patentable.

## II.

As we have already pointed out, the flared bearing in '604 performed both a structural function and a sealing function. If only the former were involved, CTS clearly would have been obligated to call the Patent Examiner's attention to '478. Indeed, in view of the discussion of the structural importance of the flared bearing in '604, we are somewhat surprised and troubled by the failure even to cite '478 during the prosecution of the '604 application. Nevertheless, we accept appellee's argument that since '478 described a component which was not enclosed in a housing, and therefore had no relevance to the function of sealing an opening in a housing, prior art which disclosed the use of comparable closures to seal openings in other enclosed devices was more pertinent than '478.[15]

That conclusion does not necessarily lead to the further conclusion that the failure to cite '478 did not violate the applicant's duty of disclosure. We must assume that the applicant deliberately decided not to call the Examiner's attention to '478, since it was one of its own patents, cf. *Armour & Company v. Swift & Company,* 466 F.2d 767, 777–779 (7th Cir. 1972), and we are unwilling to assume that the Examiner was familiar

---

13. In '478 what we refer to as a "flared bearing" is actually described as an "enlarged portion" of the shaft. (See column 4, lines 34–38; it is element 31c in Figs. 1 and 3.)

14. Claim 1 of '604, which reads as follows was allowed only after an amendment which added the italicized language:

"1. A variable resistance control comprising a dust excluding housing having a plurality of walls, *a base closing the housing and forming a wall thereof,* an aperture in one of the walls, a driver supported by the housing for rotation relative thereto, resistance means supported within the housing, *and* a contactor wipingly engaging the resistance means and constrained to rotate with the driver, the driver comprising a body portion and a barrel integral with the body portion, the barrel extending through the aperture with a portion of the barrel securing the driver to the housing, *said portion of the barrel including a flared bearing extending outwardly from* the periphery of the aperture."

The importance of the dust-excluding function is repeatedly emphasized in the specifications. See, e. g., Col. I, lines 17, 44–56, 69–70; Col. II, lines 12–15, 32–35.

15. CTS cited Patent No. 3,215,303 on "Closure for Openings in the Walls of Electrical Outlet Boxes and the Like" (see especially column 2, lines 59–69) and Patent No. 3,099,057 on "Retaining Fasteners" (see especially column 4, lines 12–19).

with it, *id.* at 779. Notwithstanding these assumptions, the patentee is correct in emphasizing the improbability that a patent on an unenclosed control would affect the Examiner's evaluation of a means for effectively sealing the opening in a housing during adjustment of the control. We therefore conclude that it was a permissible exercise of judgment for CTS to omit the citation of the '478 patent during the processing of the '604 application.

### III.

Our reasons for affirming the district court's infringement finding may be briefly stated.

In the device disclosed in the '604 specifications, and in the components actually marketed by CTS, the base of the housing is made of plastic and has the resistance element affixed to it. In contrast, in Piher's PT–15 trimmer, the metal collector also serves as the base of the housing. Unquestionably, if a metal base were used in the CTS device, it would not function. There is, therefore, a rather dramatic difference between the two devices.

■ The question of infringement, however, is answered by comparing the accused device with the claims of the patent, not with any particular embodiment—even the preferred embodiment—of the invention.[16] The claims in the '604 patent do not require that the base of the housing be a nonconductor. Despite the different arrangement of the elements of the Piher trimmer, each of the elements described in the '604 claims may be found therein. The district

court so found, and that finding is supported by the testimony of plaintiff's expert. Most importantly, the arrangement of the base of the housing, the collector, and the resistance element is really not relevant to the question whether the accused device uses a flared bearing on a driver to perform a sealing function. The critical element of the invention is found in Piher's trimmer.

■ Piher's second attack on the infringement finding was first advanced in its reply brief in this court. Piher points out that the shaft in the PT–15 trimmer protrudes through an opening in the bottom as well as through a second opening in the top of its housing, and that the flared bearing seals only one of the two holes.[17] It would seem to follow that the housing was not designed to exclude dust. In contrast, the '604 device has only one opening in its housing and the '604 claims refer to "*an* aperture in one of the walls" and described the location of the flared bearing with reference to the periphery of "*the* aperture."

It is not the fact that the Piher device has two holes rather than only one that casts doubt on the infringement finding; for surely if both holes were sealed with flared bearings, there would be infringement. Rather, it is the fact that there appears to be no seal at all over one of the holes that raises the question whether Piher's housing is intended to exclude dust. But this question was unequivocally answered in the trial court when Piher's counsel acknowledged that Piher had made no attempt to prove that the Piher trimmer does not have a dust excluding housing.[18] Thus, we must as-

16. The phrase "infringement of a patent" is somewhat misleading since it is the claims of the patent which define the boundaries of the patent grant. See Deller's Walker on Patents, 2d Ed., § 509, p. 165. Although there are situations in which the scope of the claim may be limited by construing it in the light of the specifications, see *McClain v. Ortmayer,* 141 U.S. 419, 424, 12 S.Ct. 76, 35 L.Ed. 800, we see no reason why the portions of the claim describing the use of the flared bearing to seal in aperture in the housing should be limited by a description in the specifications relating to another wall of the housing.

17. Actually, in the trial court Piher's theory of noninfringement appears to have been that its flared bearing did not even seal one of the holes. The district court rejected that theory and we do not understand appellants to pursue it on appeal.

18. See Tr. 2346–2347. This position in the trial court was apparently compelled by a representation made by Piher to the Tariff Commission with respect to the dust excluding character of its product.

sume that the second opening is effectively sealed against dust by a noninfringing means—perhaps merely a close adjustment between the driver and the aperture. That assumption, however, does not undermine the sufficiency of the finding that the flared bearing, when it does perform a sealing function, infringes the '604 patent.

We conclude that the record adequately supports the finding of infringement.

## IV.

The fourth and fifth issues relate to the validity of the '285 patent. That patent describes a control which differs from the prior art in two important respects. The metal collector serves as the base of the housing, thereby reducing the number of parts,[19] and the contactor is pinched between the collector and the resistance element which are in parallel planes, thereby maintaining a more constant pressure between those two elements than when the spring-like contactor is employed between the two elements arranged concentrically in the same plain.[20] Both of these functions are also found in Piher's PT–15 trimmer.[21] As already noted, there is an interference proceeding pending in the Patent Office to decide the question of priority of invention.

CTS may have been the first to experiment with the '285 construction, but Piher appears to have been the first to exploit it commercially.

In 1967, CTS commenced a "low cost 450" project which eventually resulted in the '285 patent. After rudimentary testing of the handmade model, detailed drawings of the device shown in the '285 patent were prepared, about $20,000 was invested in the acquisition of temporary production tools, and a number of prototypes were assembled. These samples were tested in May of 1968. Although a defect was found in the samples, CTS determined that the defect was easily correctable and that the samples were commercially satisfactory. There is also testimony that other samples tested in January of 1969 were found to be fully operable. On the basis of that evidence, the district court found that the invention had been reduced to practice in May, 1968, and again in January, 1969. The '285 patent application was filed on

19. "Another object of the present invention is to provide a variable resistance control utilizing a minimum number of parts by using the collector as a cover for the housing." Col. 1, lines 73–75; column 2, line 1.

20. "Yet another object of the present invention is to provide a variable resistance control with the contactor pinched between the resistance element and the collector to thereby maintain equalized contact pressures on the resistance element and collector." Column 2, lines 13–17.

Both of the features mentioned in the text are identified in claim 1 of the '285 patent which reads as follows:

"1. A variable resistance control comprising a housing defined by a skirt and an end wall integral with said skirt, a resistance element lying in a plain and supported flatwise against the end wall of said housing, a collector supported by said skirt and having a diameter slightly larger than the diameter of the resistance element and closing one end of the housing, said collector being provided with an aperture, said collector being substantially flatwise and lying in a plane in spaced parallel relationship to said plane containing said resistance element, a contactor rotatable about an axis and positioned between said resistance element and said collector, and driver means for rotating said contactor whereby upon rotation of said driver means said contactor wipingly engages said resistance element and said collector, said collector rotatably supporting said driver means in said aperture."

21. These features were plainly identified in the testimony and exhibits presented by plaintiff's expert witness in support of the claim that the PT–15 trimmer infringed the '604 patent. Of course, as CTS argues, the fact that the trimmer which Piher was marketing at the time the litigation was commenced contained the same features as those discussed by the '285 patent does not necessarily prove that earlier models of the trimmer contained the same features. However, an examination of the Piher patent application filed in the United States on July 28, 1969, claiming the benefit of filing dates of July 30, 1968, and May 13, 1968, for corresponding Spanish patents, together with testimony in the record, strongly indicates that these essential features were embodied in Piher's device from its inception.

March 16, 1970, and the patent issued in 1972. CTS has not yet marketed its "low cost 450" control, but one of its witnesses testified that it plans to do so in the future.

Piher filed a Spanish application on its PT–15 trimmer in July of 1968. In the fall of that year, the witness Adams, who was the manager of International Materials for Motorola, visited Piher's facilities in Barcelona and was shown prototypes of the new trimmer. Toward the end of the year he received samples from Piher and placed an order for a production trial run in January of 1969. A portion of that order was shipped from Barcelona on March 3, 1969, and was delivered to Motorola in April.

Piher's principal attack on the validity of the '285 patent is based on evidence relating to this shipment which left Barcelona more than a year before the date of the application for the patent but did not arrive in the United States until after the critical date. Some of this evidence was admitted and some is in the record as part of Piher's several offers of proof which the trial judge rejected. Before discussing the specifics of that evidence it is important to identify the material issues.

■■ The challenge rests on § 102(b) which defines the so-called "on sale" defense. The statute speaks in terms of "the invention" being on sale in the United States more than one year prior to the application date.[22] It might more

precisely have referred to a device embodying or disclosing the invention. In any event, the defense is most frequently asserted on the basis of evidence that the patentee's own product was on sale more than a year before the patent application was filed.[23] The statutory purpose in such cases is to make sure that the inventor may not extend the period of patent protection for the commercial exploitation of his monopoly beyond the statutory term.[24]

■ But the defense may also be predicated on evidence that the invention was disclosed in a product sold by someone other than the patentee more than a year before the filing date. *Dunlop Holdings, Ltd. v. Ram Golf Corp.,* 524 F.2d 33, No. 74–2024 (7th Cir. 1975). In such cases, the statutory purpose is to preclude the award of a patent to a person who is not actually the inventor; proof that a product was on sale in the United States more than a year before the application date conclusively places that product in the category of prior art of which the inventor is presumed to have had knowledge. See Judge Duffy's opinion in *Illinois Tool Works, Inc. v. Solo Cup Co., Inc.,* 461 F.2d 265, 270–271 (7th Cir. 1972). The "on sale" defense in this case[25] in effect raises the question whether Piher's PT–15 trimmer must be regarded as prior art because it was on sale before the critical date of March 16, 1969.

22. The text of § 102(b) reads as follows:
"§ 102.
"A person shall be entitled to a patent unless—

* * * * * *

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or . . . ."

23. See, e. g., *Amphenol Corp. v. General Time Corp.,* 397 F.2d 431 (7th Cir. 1968); *Frantz Mfg. Co. v. Phenix Mfg. Co.,* 457 F.2d 314 (7th Cir. 1972); *Dart Industries, Inc. v. E. I. DuPont De Nemours and Co.,* 489 F.2d 1359 (7th Cir. 1973); *Red Cross Mfg. Corp. v. Toro Sales Co.,* 525 F.2d 1135 (7th Cir. 1975).

24. "The policy underlying the 'on sale' bar is to prevent an inventor from holding back the secrets of his invention from general public knowledge while at the same time exploiting it commercially, thereby extending the duration of his legal monopoly." *Red Cross Mfg. Corp. v. Toro Sales Co., supra,* 525 F.2d at 1135.

See, also, *Frantz Mfg. Co. v. Phenix Mfg. Co., supra,* 457 F.2d at 320.

25. Since the "on sale" issue was raised by Piher's counterclaim, it is not actually a "defense" in this case; however, since the issue is normally raised by the defendant, it seems appropriate to follow the practice of referring to it as a defense.

We first put to one side an argument that CTS repeatedly asserted in the district court and which may have provided an erroneous predicate for some of the trial judge's evidentiary rulings. CTS contended that Piher was required to prove a completed sale in the United States prior to the critical date. Admittedly, Piher proved no such sale. But if it was then offering to prospective purchasers in the United States a product which (a) embodied the '285 invention and (b) was complete in the sense that it represented a reduction of the invention to practice, the invention was on sale within the meaning of the statute and the '285 patent is invalid.[26]

There is substantial evidence in the record supporting the conclusion that Piher's PT–15 trimmer disclosed the essential elements claimed in the '285 patent. Piher's trimmer was described in detail by the CTS expert who explained why it infringed the '604 patent; his testimony and the exhibits he prepared clearly disclosed the use of a metal collector as a base for the housing, and also the contactor pinched between the collector and the resistance element in separate parallel planes. Moreover, in its original complaint, CTS alleged that the PT–15 trimmer infringed the '285 patent.

■ CTS points out, however, that the fact that the invention was disclosed in Piher's trimmer in 1972 when the suit was filed does not necessarily establish the fact that it was embodied in any device which was on sale prior to March 16, 1969. For there is evidence in the record that the trimmer has been modified from time to time, and Piher had the burden of proving that it reduced the concept to practice before the critical date. *See Dart Industries, Inc. v. E. I. DuPont De Nemours and Co.,* 489 F.2d 1359, 1364 (7th Cir. 1973). Thus, the character of the devices shipped by Piher on March 3, 1969, was of critical importance.

■ Adams testified that after those devices were delivered to Motorola in April of 1969, they were turned over to Gunar Klass for evaluation. Klass testified that he conducted a series of tests in April, May and June of 1969. CTS seems to have persuaded the trial judge that evidence regarding these tests was irrelevant because the product did not arrive in the United States until after the critical date.[27] CTS convinced the trial judge that a copy of the Motorola purchase order issued on January 22, 1969, relating to the March shipment was inadmissible because it did not constitute "the best evidence" of what Motorola had ordered, and its relevance was not manifest from the face of the document. CTS also persuaded the court to exclude testimony by Klass, who had been responsible for Motorola's testing of the Piher device, in which Klass described the essential features of that device.[28] The court also sustained objec-

---

**26.** See cases cited in n. 23, *supra.*

**27.** "MR. WYSS: I object to the so-called offer of proof for a number of reasons. First of all, this device, according to the witness' own testimony, was—if it was—received by him on or about April 11, 1969, so it is much too late for anything in connection with this lawsuit and is therefore, under the provisions of Rule 43(E) not admissible on any ground.

    MR. ROHRBACK: (C).

      \*   \*   \*   \*   \*   \*

    THE COURT: I sustain the objection of the plaintiff to the offer of proof made by the defendant in connection with the offer of Defendant's Exhibit 48 for identification." (Tr. 1602–1603).

**28.** During the offer of proof, the witness disassembled the exhibit while he was on the witness stand and identified the collector as a part of the base and the contactor's location pinched between the resistance element and the collector. The testimony was in part:

    "Q Would you tell us what is inside Defendant's Exhibit 48 for identification?

    A Inside we see the contactor, which is mounted on the plastic rotor. I will remove that, together with the rotor, and we also see the resistive element with the two terminals attached to them internally.

    Q Where is the resistance element?

    A The resistance element is mounted within the plastic body, cavity and is retained by a terminal on both sides.

tions to the admissibility of one of the devices which the witness identified as having been tested in 1969 on the ground that it had not been in the personal custody of the witness for about a year, but rather had been in the custody of Motorola's patent department, and there was no absolute assurance that the offered exhibit was the one he had tested. The arguments over the admissibility of these exhibits and this testimony were extensive and we are not entirely sure that we understand the basis for the various restrictive rulings made by the trial judge. We have no doubt, however, that the purchase order was relevant and that the fact that it was a carbon rather than a ribbon copy did not justify its exclusion.[29] Moreover, the

lengthy testimony of the witness Klass, which we have studied with care, contains sufficient assurance that the offered exhibit was one of the devices ordered in January and received in April to have justified its admissibility.[30] As CTS argues, the record does not entirely foreclose the remote possibility that this particular device was mislabeled, or confused with another device when it was in the custody of Motorola's patent department; such a possibility affects the probative value of the exhibit, but in view of the positive character of the witness's testimony that it was one of the devices which had been tested in 1969, and that it was one that had been received pursuant to the January order, it should have been admitted. Surely, in a case tried to

"Q Where was the contactor with respect to the resistive element and the collector when you opened up?

A The contactor is—

Q Defendant's Exhibit 48 for identification.

A The contactor is positioned on top of the rotor and is between the resistance element and the collector." (Tr. 1601–1602)

**29.** The misnamed "best evidence" rule is found in Rules 1002, 1003, and 1004 of the new Federal Rules of Evidence. Since the excluded copy of the purchase order was a duplicate, its admissibility was covered by Rule 1003, which provides:

"A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

A "duplicate" is defined in Rule 1001(a)(4) as: ". . . a counterpart produced by the same impression as the original, or from the same matrix, or by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, or by chemical reproduction, or by other equivalent techniques which accurately reproduces the original."

We find no basis in the record for questioning the authenticity of the purchase order. At the time the purchase order was offered, a Motorola employee, Adams, was on the stand and in the offer of proof testified that the order was made by a Mr. Pinter under Adams' direction. Adams also testified as to when the order arrived, what devices were ordered (Motorola part numbers appear on the order rather than Piher numbers), and when he had first seen the Piher devices which are the subject of

the order. Although there is no direct testimony describing the document as a "carbon copy," in the absence of any evidence to the contrary, we draw this inference from the copy of the document which was offered for examination in light of the testimony of the witnesses from Motorola. CTS, however, on remand, retains the right to question the document's authenticity.

**30.** "By Mr. Jones:

Q Mr. Klass, I hand you Defendant's Exhibit 48 and ask you to describe it from its visual appearance from the exterior.

A It is a PT type—PT–15 Piher molded housing potentiometer, has our production part number on it, has our test lab number 4 test tag on it, has a molded-in Piher Spain name on it.

Q Can you tell us what parts are visible from the exterior?

A The parts visible from the exterior is the molded plastic body, the collector, which is sealed with the body, has a plastic rotor and has two terminals.

Q Is there any doubt in your mind, Mr. Klass, as to whether or not that is the same number 4–PT trimmer that was tested in or about April of 1969 and reported on in Defendant's Exhibit 47 for identification?

A That is my testimony. That is the device I removed from my—

THE COURT: Did you hear the question?

THE WITNESS: Please read it.

(Question read.)

A There is no doubt in my mind." (Tr. 1598–1599)

For discussion of identification and chain of custody of "Real" evidence in civil cases see Admission of Demonstrative Evidence, 61 N.w. U.L.Rev. 472, 478–479 (1966).

the court without a jury, discretion in such evidentiary rulings should be exercised in favor of admissibility, particularly when the record is more apt to be encumbered by extensive argument over issues of admissibility than by the evidence itself.[31]

If the physical exhibit identified by Klass had been admitted, and if the trial court had accepted his oral testimony presented in an offer of proof, the evidence would have been sufficient to support findings of fact establishing Piher's "on sale" defense. For that evidence tended to prove that the device which Motorola received in the United States in April of 1969 disclosed the '285 invention. Moreover, Klass' testimony about the tests performed under his direction, together with evidence that these devices were shipped from Barcelona on March 3, 1969, was sufficient to justify the inference that the Piher control had been reduced to practice prior to the critical date.[32] Thus, the erroneous evidentiary rulings prevented Piher from presenting a possibly meritorious defense.[33]

Piher argues that we should therefore hold the '285 patent invalid. Such a holding, however, would require us to make the requisite findings of fact in the first instance and to conclude that Piher has met its burden with clear and convincing evidence. As we have indicated, if the proffered testimony is credited, it appears that Piher will prevail. But the question of credibility and the interpretation of the exhibits are matters that must be decided in the first instance by a trial judge. We therefore remand for a new trial of all issues raised by Piher's on sale challenge to the validity of the '285 patent.

## V.

As already noted, CTS has never marketed its "low cost 450" control commercially. Moreover, there were defects, albeit correctable, in the prototypes which CTS tested. Piher therefore argues that the invention was not useful, that the best mode of carrying it out was not described in the '285 patent specifications, and that the invention was abandoned. The trial judge rejected each of these contentions and we cannot say that his findings are clearly erroneous.

The fact that there was a defect in the prototypes surely does not demonstrate that the *invention* was not useful. Indeed, since the basic features of the invention appear to be embodied in Piher's PT–15 trimmer—as may fairly be inferred from Piher's on sale defense and CTS' original charge that the PT–15 infringes the '285 patent—and since Piher's trimmer is evidently a commercial success, it seems logical to infer that the subject matter of the invention is useful within the meaning of § 102.

Similarly, even if the CTS prototypes are not the best possible embodiment of the invention, we find nothing in the record to support the argument that the

---

31. *See generally Brubeck v. Pennsylvania R. Co.,* 346 F.2d 238, 241 (7th Cir. 1965); *Reid v. Quebec Paper Sales & Transp. Co.,* 340 F.2d 34 (2d Cir. 1965); *New York Life Ins. Co. v. Harrington,* 299 F.2d 803, 806 (9th Cir. 1962); McCormick, Evidence, 1954, § 60; see also Davis, Hearsay in Nonjury Cases, 1970, 83 Harv. L.Rev. 1362.

32. We have not found it necessary to decide whether error was committed in the exclusion of the reports written in Spanish by the former president of Piher describing his sales activities in the United States during early 1969. Our disposition of the case will enable Piher to make a fresh offer of this evidence and the

trial judge who will hear the new trial to make a fresh appraisal of these evidentiary rulings which appear to have been unnecessarily restrictive in a case tried by the court without a jury.

33. Although a substantial portion of the cross-examination of Klass was directed to demonstrating that most of the tests were not completed until May or June, instead of during the month of April, as he testified on direct examination, the timing of those tests is really of no relevance if it is assumed that Piher's evidence was adequate to sustain a finding that the devices being tested had left Piher's factory in a completed form prior to the critical date.

inventors contemplated a better mode than that disclosed in the specifications. Section 112 merely requires that the patent disclose "the best mode contemplated by the inventor of carrying out his invention."

■ Finally, the fact that CTS promptly filed its patent application forecloses the contention that the invention was abandoned within the meaning of § 102(c). There are, of course, cases in which the character of the commercial exploitation of an invention will be relevant to the issue of abandonment, *cf. Dunlop Holdings, Ltd. v. Ram Golf Corp.*, 524 F.2d 33, No. 74–2024 (7th Cir. 1975), but if the application is promptly filed and diligently prosecuted, the decision to postpone commercial development does not constitute abandonment.

### VI.

The district court refused to award costs to CTS, even though it prevailed on all issues decided by the district court. CTS has therefore filed a cross appeal, relying heavily on our recent decision in *Popeil Bros., Inc. v. Schick Electric, Inc.*, 516 F.2d 772 (1975). In view of our remand for a new trial of the on sale defense, we believe that the question of what costs, if any, CTS should recover, can await the conclusion of the proceedings in the trial court.

The judgment of the district court is affirmed in part and reversed in part.