**Frederick TAUSSIG, Plaintiffs,**

v.

**JACK & JILL ONE HOUR CLEANERS, NO. 12, INC., et al., Defendants.**

**Civ. A. No. C76–159A.**

United States District Court, N. D. Ohio, E. D.

Sept. 13, 1978.

Carl A. Rankin, Cleveland, Ohio, Edward H. Renner, St. Louis, Mo., for plaintiffs.

Alfred D. Lobo, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

This is an action for alleged infringement of a United States patent. The Court having duly heard testimony and received exhibits, the following shall constitute the Court's findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

### THE PARTIES

Plaintiff Frederick Taussig initiated this action to redress the alleged infringement of United States Letters Patent No. 3,733,-267 (hereinafter the 267 patent). Said patent was issued to Gordon W. Haase on May 15, 1973, based upon an application filed April 17, 1970. Plaintiff Taussig is the owner of the 267 patent by assignment from the inventor Haase. At trial and pursuant to stipulation of the parties, Kleen-Rite/Arundale, Inc., was joined as a party plaintiff. Kleen-Rite is a Wisconsin corporation and plaintiff Taussig's exclusive licensee.

Originally plaintiff brought the within action solely against defendant Jack and

Jill One Hour Cleaners No. 12, Inc. By an amended complaint filed July 16, 1976, Robert F. Giles was added as a party defendant. It appears that Jack and Jill One Hour Cleaners No. 12, Inc., is a defunct corporation and that defendant Giles is now doing business as Jack and Jill One Hour Cleaners. Defendant D. C. Filter and Chemical Inc. (hereinafter D. C. Filter) was subsequently granted leave to intervene in this action as a party defendant. D. C. Filter is a corporation duly organized under the laws of the State of Ohio with its principal place of business located in Sandusky, Ohio.

## PLEADINGS

Essentially, plaintiffs assert that defendants are directly infringing the 267 patent by practicing a process for cleaning and reconstituting dry cleaning fluids which embodies every element of the patent invention. They also allege that defendant D. C. Filter has contributorily infringed the 267 patent by selling apparatus for use in practicing the patent process to defendant Jack and Jill One Hour Cleaners in violation of 35 U.S.C. § 271(c). Plaintiffs further assert that defendant D. C. Filter has actively induced infringement of the 267 patent by selling filters especially adapted for use in the patent process, by selling equipment designed to practice said process, and by advertising that its filters and equipment are substitutes for that of plaintiff and successfully practice the process of the 267 patent, in violation of 35 U.S.C. § 271(b).

The allegations of contributory infringement and inducement of infringement are not contained in plaintiff's complaint, and the Court, in its Order of August 1, 1977, denied their motion for leave to amend the complaint accordingly. In their Post Trial Brief, plaintiffs request, pursuant to Rule 15(b), Federal Rules of Civil Procedure, leave to amend the pleadings to conform to the proofs offered at trial. Upon consideration, the Court hereby grants plaintiffs leave to amend their complaint to allege contributory infringement and inducement to infringe within fifteen (15) days of the date of this Order.

Relief in the form of a permanent injunction and damages is sought by plaintiffs herein.

Defendants essentially deny the allegations of the complaint, and assert that the 267 patent is invalid and unenforceable. They allege that the process patented was anticipated by the prior art, and was in public use or on sale in the United States more than one year prior to the date of the application for the patent, in violation of 35 U.S.C. § 102(b). Further, defendants contend that the alleged invention of the 267 patent was obvious at the time thereof to a person having ordinary skill in the art to which the subject matter pertains within the meaning of 35 U.S.C. § 103. Additionally, they allege that the claims of the 267 patent are ambiguous and indefinite, and thus fail to clearly disclose and define the alleged invention within the meaning of 35 U.S.C. § 112. Further, defendants assert that plaintiffs procured the 267 patent by a lack of candor and fraudulent misconduct in the proceedings before the U.S. Patent and Trademark Office. Thus, in their counterclaim, defendants request a judgment declaring that the 267 patent is void and unenforceable, and that they have not infringed same.

By Order of July 27, 1977, the Court granted defendants' motion for a separate trial of the following issues: (a) infringement, (b) offer for sale, and sale, more than one year prior to April, 1970 filing date of the Haase patent application which issued as U.S. Patent No. 3,733,267, (c) prior public use more than one year prior to April 17, 1970, and (d) anticipation. As stated above, trial before this court was held on those issues as scheduled. Trial of the remaining issues raised by defendants was reserved until a future date.*

## JURISDICTION

The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1338.

---

* Thus the Court shall not at this time address the issue of patent invalidity on the basis of obviousness, and lack of candor and fraud in the procurement of the 267 patent.

## FINDINGS OF FACT

In approximately 1965 or 1966, Gordon W. Haase, a resident of Madison, Wisconsin, left his employer the Dairy Equipment Company with the idea of entering the air filtration business. Apparently by accident he attended the National Institute of Dry Cleaners Exhibition at McCormick Place in Chicago, Illinois. At that exhibition, Haase observed dry cleaning equipment utilizing a small filter to filter solvents. The display was by Frigidaire, a division of General Motors, and the filter consisted of a perforated metal cannister similar to an oil cartridge. Haase was of the opinion that the filter did not work due to the absence of flow rate ability. The constant and continuous flow of fluid through the filter is essential to the filtration of the solvents.

Upon his return to Madison, Haase attempted to do research in the area of dry cleaning filtration. His efforts, however, proved futile. Nevertheless after some contemplation, Haase built a carbon filter cartridge consisting of a perforated steel cylindrical shell with a granular carbon core. The cartridge was somewhat larger than the General Motors A/C cartridge and was put into a cannister. It was built to be piped into a regular coin operated dry cleaning machine. Haase, in fact, tested this carbon cartridge in a Chicago coin operated dry cleaning establishment. In terms of loads of clothes cleaned, Haase's carbon filter cartridge ran twice as long as the Frigidaire cartridge before losing its effectiveness or becoming plugged up and preventing the free flow of solvent. In performing these tests, Haase checked both color and flow rate. However, he was not satisfied with this improvement since the cost of operating the cartridges was too high.

In early 1966, Haase built a cartridge with only carbon impregnated paper and without a granular carbon core. Inside the cartridge was a core of perforated steel surrounded by the pleated carbon paper and an outer shell of pleated white filter paper. The test results received from this cartridge were better, and so Haase built a few more

and attempted to sell them. The price of the carbon impregnated paper sold by the C. H. Dexter Company, however, became prohibitive for Haase. He felt it was not economically feasible to continue making the all paper cartridges and thus discontinued so doing.

Persisting in his endeavor, Haase proceeded to redesign his dry cleaning filter cartridge. His next cartridge consisted of a core of perforated steel surrounded by a filter bag containing granular carbon, another steel shell, and finally an outer enclosure of pleated filter paper. The filter bag, however, plugged much too quickly to be effective. Haase thus eliminated the filter bag and obtained perforated steel with finer holes. He was still not satisfied with the results obtained, however.

As stated above, Haase had been testing his filter cartridges in a coin operated dry cleaning establishment. He finally visited a commercial cleaner and found that the dry cleaning fluid was distilled after filtration in order to obtain a reconstituted solvent of sufficient quality for reuse in the cleaning process. Haase had learned that carbon removed only color from the dry cleaning solvents. Distillation was still necessary to remove nonvolatile residue or fatty acids from the dry cleaning solvents. Commercial dry cleaners, and generally not coin operated cleaning establishments, used the distillation process to clean the solvents for reuse. Distillation was, however, an undesirable process. It was not only expensive, but also was only approximately ninety percent effective in reconstituting the dry cleaning fluids. Moreover, distillation was a source of pollution and a health hazard; it also required additional labor.

The commercial dry cleaners visited by Haase were using an Olsen filter. This filter had a screen that held diatomaceous earth and activated carbon. This filter did not, however, effectively remove fatty acids from the dry cleaning solvents. Thus, as stated above, the commercial dry cleaners had to use a still in addition to the filter to satisfactorily clean the fluids.

Apparently during 1966, Haase learned a new filtering method. He heard that another individual was using powdered attapulgite clay and testing it in place of diatomaceous earth. Haase thereupon decided to test attapulgite clay for the removal of fatty acids from dry cleaning solvent. He had at some time prior thereto set as his goal the development of a no-still process for reconstituting dry cleaning solvent. In other words, Haase was determined to discover or invent a filtration process which satisfactorily cleaned dry cleaning fluids without the need for distillation so that the solvents could be successively reused.

Haase initially ran a number of laboratory tests whereby he poured dirty dry cleaning solvent into attapulgite clay, allowed the mixture to settle, and then poured off the solvent. He tested such solvent for its fatty acid content using a Bronoco fatty acid test kit. Said kit was given to Haase by the Ashland Oil Company of St. Louis, Missouri, from whom he obtained the attapulgite clay. The clay Haase obtained from Ashland consisted of coarse granules; Ashland had suggested that Haase try an approximately 4/8 mesh granulation, that is clay with granules that were smaller than 4 mesh but larger than 8 mesh in size. Based on his laboratory test, Haase concluded that the attapulgite lowered the fatty acid content of the dry cleaning solvent. He believed that if he mixed activated carbon and attapulgite clay in the filter cartridge he could improve his product.

Thereafter, Haase built a dry cleaning filter cartridge with attapulgite clay and activated carbon. The cartridge consisted of a fluted filter paper shell on the outside and a mixture of 12/24 granulation carbon and 4/8 granulation clay on the inside surrounding a perforated steel cylinder. Haase tested this cartridge in coin-operated dry cleaning establishments in Chicago, Illinois and Sun Prairie, Wisconsin. A single filter cartridge was placed in a vertical cannister in these establishments. These clay and carbon cartridges, however, were not able to remove fatty acids consistently and satisfactorily.

Haase thus contacted Ashland Oil to inquire if it had any other granulations of attapulgite clay which would produce the desired result. He obtained samples of a few other granulations from Ashland. Haase did not know the mesh sizes of the clay samples, but knew that the granulations were slightly smaller than 4/8 mesh. He laboratory tested these finer granulations and found an improvement in the removal of fatty acids from dry cleaning solvent. He thus proceeded to build filter cartridges containing about six to eight pounds of attapulgite clay and eight pounds of activated carbon. These cartridges with the slightly finer, yet still relatively coarse, granulations were tested in Sun Prairie, Wisconsin. Haase observed an improvement in the fatty acid removal, but such was still not completely satisfactory to him.

Based on the record herein, the Court finds that Haase, doing business as D & B Manufacturing Company, purchased a substantial quantity of attapulgite clay from Ashland Oil beginning as early as August 7, 1966. At that time, he obtained fifty bags of Ashland's Bronsorb clay, each bag containing fifty pounds thereof. Although Ashland sold and distributed clay under its own brand names, it actually purchased clay from Floridin Company. The Floridin counterpart for Ashland's Bronsorb Granular was Florco and for Bronsorb Special was Florex AA LVM. Florex is attapulgite clay which has been specially processed to increase its surface area and significantly improve its selective adsorption efficiency. It was available in the following standard mesh classifications: 2/4, 4/8, 8/16, 16/30, 20/40, 25/50, 30/60, 60/100 and 100/up. According to the Floridin data sheet on Florex, apparently published prior to April 1, 1967, special mesh classifications were available upon request.

Throughout 1967 and 1968, Haase built dry cleaning filter cartridges in an effort to refine and improve the process. It appears that he had by this time in fact developed a process for reconstituting dry cleaning solvent which removed fatty acids and eliminated distillation. Haase's cartridges con-

tained a mixture of attapulgite clay and activated carbon. He did not build either carbon only or clay only cartridges since neither would practice an effective no-still process. A coarse granulation clay was used in these cartridges. Although Haase was able to recognize 4/8 mesh clay, he could not classify the mesh sizes of the slightly finer, yet relatively coarse, granulations. Thus when he purchased clay from Ashland he simply requested coarse attapulgite clay without specifying a certain mesh classification. In view of the foregoing, the Court finds that during 1967 and 1968 Haase could have obtained and used, and did in fact obtain and use as shown below, clay of a granulation finer than 4/8.

In the fall of 1967, Haase came into contact with the Barnes Drill Company of Rockford, Illinois. Barnes Drill was interested in entering the dry cleaning filtration equipment business; it wanted to design and produce a hydrocyclone filtration unit for use in the dry cleaning industry. Haase visited Roger Marriott, President of Barnes Drill, in Rockford. Marriott showed Haase the cyclone his company wanted to develop and asked Haase if he could build a carbon cartridge for use therein. Haase told Marriott that he could do as good a job as the A/C Filter Division of General Motors and that he could make larger cartridges. However, he also apprised Barnes of his work with cartridges containing attapulgite clay. Since Barnes was a neophyte in the dry cleaning industry, it was apparently unaware of the presence of fatty acids in the solvent and the need to remove them therefrom. Haase explained that attapulgite clay could control and remove fatty acids from dry cleaning solvent. He apparently convinced Barnes of the merits of his process and persuaded it to use his clay-carbon cartridges instead of carbon only cartridges. Thus Barnes under the direction of its assistant chief engineer, Mark Estabrook, redesigned the cyclone unit to incorporate the Haase process.

Subsequently, Haase built a dry cleaning filter cartridge for Barnes which contained approximately eight pounds of activated carbon and the balance of coarse attapulgite clay. It is clear that Haase intended that the clay remove fatty acids from the dry cleaning fluid.

In its laboratory, Barnes actually tested the Haase cartridge in its cyclone, and found that it cleaned dirty solvent. Apparently satisfied with the test results, Barnes initially ordered one hundred cartridges from Haase doing business as D & B Manufacturing Company on December 8, 1967. (Px 46). Pursuant to the purchase order, these cartridges were each to contain eight and one half pounds of carbon and seven pounds of Bronsorb or attapulgite clay. Thereafter on January 31, 1968, Barnes ordered an additional one thousand cartridges from Haase, each of which was to contain eight pounds of carbon and eight pounds of Bronsorb. During 1968, Haase built and delivered several hundred such cartridges to Barnes and actually received payment therefor. In late summer 1968, however, Barnes cancelled the balance of the order.

Barnes Drill sold its first Cyclonic Solvent Filter (CSF) dry cleaning unit to Eugene Smith, a distributor of dry cleaning and laundry equipment in Stockton, California. Smith had seen an advertisement for the unit in a trade journal and thereupon phoned Barnes Drill in order to obtain more information regarding it. Subsequently Smith traveled to Rockford, Illinois to further investigate the equipment and observe its operation. During his visit in December 1967, Smith placed the aforementioned first order for a CSF unit with clay-carbon cartridges. Said unit was subsequently shipped to Smith in California during early January 1968.

Smith personally installed the CSF unit at Jackson Cleaners and observed its regular operation over a six month period. This CSF unit utilized Haase's clay-carbon filter cartridges in cleaning and reconstituting the Stoddard petroleum solvent. Although the unit worked satisfactorily, it proved inadequate to handle the cleaning load at Jackson Cleaners. There were apparently an insufficient number of filter cartridges in the unit to handle the flow of solvent;

however, this was not known at the time. The cartridges thus became plugged thereby preventing the constant and continuous flow of solvent, and necessitating a more frequent change of cartridges than expected. In addition to the original set of cartridges, the clay-carbon cartridges used in the CSF unit at Jackson Cleaners were changed or replaced about three times during the course of its operation. As a result of such unanticipated shortened cartridge life, the per pound cost of cleaning clothes was actually about double that which was expected from utilization of the CSF unit.

The CSF dry cleaning unit operated in the normal course of business at Jackson Cleaners was eventually removed therefrom in the summer of 1968. It was placed in the salvage yard of the Eugene Smith Equipment Company, Stockton, California, where it remained until the time of this action. During the course of Smith's deposition thereat on February 23, 1977, one of the Haase filter cartridges was examined. A sample of the clay-carbon mixture removed therefrom was hand sieved to determine the mesh size of the clay particles. Such test showed the clay to be generally 8/16 mesh granulation. A second filter cartridge from said CSF unit was opened and examined at the trial herein. A hand sieve test demonstrated that the cartridge contained attapulgite clay of generally 6/25 mesh granulation.

Based on the foregoing, the Court finds that in 1968 Haase built and sold dry cleaning filter cartridges containing carbon and attapulgite clay particles finer than 4/8 mesh and of approximately 6 to about 18 or 25 mesh granulation. Further, the Court finds that such cartridges were used to reconstitute and clean dry cleaning solvent in commercial dry cleaning establishments. Such cartridges generally functioned satisfactorily, but the process needed further refinement in order to be economically successful.

In March 1968, Roger Marriott and John Koplos exhibited the Barnes Drill CSF unit at the National Institute of Dry Cleaners trade show at Cobo Hall in Detroit, Michigan. They displayed, demonstrated, and offered for sale both the CSF unit and the clay-carbon filter cartridges made by Haase and used therein.

Two CSF dry cleaning filtration units were sold by Barnes to Kingston Inc. in Rockford, Illinois during the summer of 1968. Barnes assistant chief engineer Estabrook helped install the units and observed their performance. Although they apparently reconstituted the solvents, such units did not function economically. The per pound cost of dry cleaning clothes proved to be greater than projected, and Barnes thus credited Kingston for such excess cost. (Dx J). The units were eventually removed from Kingston Cleaners because the cartridge life was not as good as expected. Since the filters had to be changed more often than desirable, additional maintenance costs were incurred which in turn increased the cost of dry cleaning.

Approximately sixteen CSF dry cleaning filtration units with clay-carbon filter cartridges were in fact sold. (Dx I). The sales were all made on a consignment basis whereby the dry cleaners were permitted to use the units for a given period of time after which payment was expected only upon the achievement of the promised satisfactory performance. It appears, however, that the CSF units did not in fact perform as well as expected. Consequently Barnes Drill in an effort to encourage continued use of the units and in apparent belief in their product, continued to supply filter cartridges to the dry cleaners giving them credit therefor. Eventually, however, Barnes recalled the CSF units in approximately 1970. It appears that Barnes ceased further production and sale of the CSF units due to the unexpected short life of the filter cartridges. According to Barnes engineer Estabrook, the basic reason therefor was that the cyclone did not perform as well as it should have performed.

Haase on his own continued to build and test clay-carbon filter cartridges in order to improve and refine the process. In late summer or early fall 1969, Haase first knowingly and specifically purchased atta-

pulgite clay of a 6/25 mesh granulation from Ashland Oil. Prior to this time, as indicated above, he did not know the actual size of the samples he had received or the clay he had purchased. He only knew that said clay was finer than 4/8 mesh granulation. He tested this finer clay and found that the adsorption thereof was much better than coarser granulation clay. Haase thus built cartridges containing a 6/25 mesh clay-carbon mixture, and tested them in the two dry cleaning establishments in Chicago and one in Sun Prairie. By the fall of 1969, Haase obtained good results therefrom, and felt that the cartridges were satisfactory. He then built a few 6/25 mesh clay-carbon cartridges which he sold to the establishments in Chicago.

Therefore, by late fall 1969, Haase was making and selling cartridges containing only the 6/25 mesh attapulgite clay and activated carbon. Besides the establishments in Chicago, he sold cartridges to dry cleaning businesses in Peoria, Illinois and Toledo, Ohio.

In about December 1969, Haase met plaintiff Taussig through a Chicago law firm. Taussig was interested in investing in a new product, and filtration in the dry cleaning industry appealed to him. After an initial meeting in Chicago, Haase showed Taussig his cartridges in operation at the Chicago and Sun Prairie establishments. He explained to Taussig that the goal of his process was to avoid distillation in the reconstituting of dry cleaning solvents. Taussig was apparently impressed and convinced of the potential commercial success of Haase's cartridge filters. Subsequently Haase and Taussig entered into an agreement whereby Haase, with Taussig's assistance, obtained a patent for the process in 1973, which patent Taussig in turn purchased in exchange for the payment of royalties to Haase. Also, Haase became an employee of Kleen-Rite/Arundale, Taussig's company. Further, Taussig purchased Haase's company, D & B Manufacturing.

Since spring 1970, Kleen-Rite/Arundale filter cartridges embodying Haase's process have been sold commercially to dry cleaning establishments. These cartridges contain eight pounds of activated carbon and eight to nine pounds of attapulgite clay. Prior to this time, Haase himself had built only clay-carbon cartridges, and not clay only cartridges. He clearly recognized and admitted that without carbon, the cartridges would not be useful. He, therefore, did not build clay only cartridges for commercial use or sale. In the years since 1970, however, Kleen-Rite has built clay only cartridges for special purchase such as for use in the cleaning of suede. It is nonetheless acknowledged that without carbon the cartridges are unable to completely remove color from the dry cleaning solvents; some other step or method is therefore necessary to completely purify the solvent.

Thereafter, on April 17, 1970, Haase filed an application for a patent on his process of filtration of dry cleaning fluid. United States Letters Patent No. 3,733,267 were subsequently issued to Haase on May 15, 1973.

In June 1974, defendant D. C. Filter and Chemical Inc. was incorporated. For a considerable period prior thereto, it had been making numerous types of filter cartridges, and thereafter it continued in the filter cartridge business. D. C. Filter first built and sold dry cleaning cartridges which contained carbon. Subsequently in 1975, at the request of Al Jacobson, president of Miracle Core Chemical Industries, it built a cartridge containing attapulgite clay in addition to carbon. D. C. Filter had been experimenting to find a filler for its carbon cartridges, and prior to this time was not aware of the function of attapulgite clay in removing fatty acids from dry cleaning solvents. Pursuant to Jacobson's specifications, they made a number of cartridges with carbon and attapulgite clay of a 16/30 mesh granulation. However, problems developed with pressure in these cartridges, and D. C. consequently contacted a clay manufacturer in order to secure a larger granulation of clay. Thereafter, D. C. used only 8/16 mesh clay in its dry cleaning filter cartridges.

Subsequently in October 1975, D. C. Filter built the prototype for its present Brute cartridge. Since November 1975 it has been producing, advertising, and selling the Brute cartridge essentially for use in a process for reconstituting and cleaning dry cleaning solvent. The D. C. Brute filter contains a mixture of carbon and attapulgite clay of 8/16 mesh granulation which surrounds a center core of perforated steel and which is surrounded by an outer shell of fluted filter paper. D. C. Filter generally does not build and sell clay only cartridges for use in the dry cleaning industry.

The Brute clay-carbon dry cleaning filter cartridge is sold by D. C. Filter for use in commercial dry cleaning establishments. Defendant Robert Giles uses solvent cleaning equipment provided by defendant D. C. Filter at his dry cleaning establishment, Jack & Jill One Hour Cleaners. The filters used by defendant Giles for cleaning and reconstituting dry cleaning solvent are supplied by D. C. Filter. The Brute filter is typical of those sold by defendant D. C. Filter and used by defendant Giles. Such filters have no present substantial use except in a process of reconstituting dry cleaning solvent.

## THE 267 PATENT

The 267 patent involves a process of filtration of dry cleaning fluid. The disclosure describes a method and apparatus which is particularly adapted to filtering liquid and consists of three processing means: a pre-filter for the removal of larger soil particles; a primary filter for the removal of small insoluble particles; and a filter-adsorber for the removal of dissolved foreign materials such as fatty acids, colors, oils and water. The latter two means comprise a removable and replaceable cartridge consisting of pleated filter paper, surrounding a coarse clay or clay-carbon adsorber unit containing heat-treated attapulgite clay particles of approximately 6/25 mesh.

The patented invention is defined in four claims. Claim 1 is independent, while claims 2 through 4 are dependent thereon. The specific claims of the 267 patent are as follows:

### CLAIM 1

In a process for removing soils and the like from a dry cleaning fluid: the steps of filtering the fluid to remove undissolved particles from the fluid by flowing said fluid through a fluted paper filter, and thereafter passing the filtered fluid through a mass of attapulgite clay particles of from about 6 to about 25 mesh that do not slake in water, to remove adsorbable material.

### CLAIM 2

In the process of claim 1 the filtering steps including: flowing the fluid through a pre-filtering device and pre-filtering the larger solid particles from the fluid, to enable the fluid to be passed through said fluted paper filter without clogging the flutes with larger solids; then flowing the fluid thereafter through said fluted paper primary filter to remove filterable solid particles therefrom that passed through the pre-filter.

### CLAIM 3

In the process of claim 1: the steps of passing the fluid into a receptacle that contains cartridge means and causing the fluid to fill the receptacle to the top of the cartridge means; causing the fluid to bear laterally upon and to flow laterally through vertically disposed paper filter flutes; thence causing it to flow laterally into and through a column of clay particles and into a discharge area for passage from the receptacle.

### CLAIM 4

The method of claim 1 wherein said attapulgite particles are from about 8 to about 16 mesh.

## DISCUSSIONS AND CONCLUSIONS OF LAW

As previously indicated, essentially two issues have been presented for resolution by the Court: whether defendants have infringed the process described in the 267 patent; and whether the 267 patent is valid. The Court shall first address the issue of validity.

■ To be patentable a device or process must involve invention and be new and useful. See 35 U.S.C. § 101. It is thus well established that novelty, utility, and invention are the three elements requisite to the validity of a patent. *United States Gypsum Co. v. Consolidated Expanded Metal Companies*, 130 F.2d 888, 889 (6th Cir. 1942), cert. denied, 317 U.S. 698, 63 S.Ct. 441, 87 L.Ed. 558 (1943). A patent is, however, presumed valid, and the burden of establishing invalidity rests upon the party asserting it. 35 U.S.C. § 282. In the instant action, defendants assert that the 267 patent is invalid under 35 U.S.C. § 102(b).

■ Section 102(b) provides in pertinent part as follows:

A person shall be entitled to a patent unless—

(b) The invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . . .

This section has been generally referred to as anticipation. The principles applicable to anticipation have been defined by the Court of Appeals for the Sixth Circuit in *Allied Wheel Products v. Rude*, 206 F.2d 752, 760 (1953):

Anticipation belongs in the field of novelty. To anticipate an invention is to negative novelty; but even though a patent is not anticipated, and is concededly novel, it may lack invention. In order to anticipate an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure, where they do substantially the same work in substantially the same way.

Therefore, a device or process lacks the essential element of novelty if there has been a substantially identical prior art structure.

With regard to the instant action, defendants assert that the 267 patent is invalid by reason of anticipation. Two grounds are alleged in support thereof: first, the process of the 267 patent assertedly has been

anticipated by a prior patented process, namely the process of United States Letters Patent No. 3,658,459; and second, the process of the 267 patent allegedly was in public use or on sale in this country more than one year prior to the date of application for said U.S. Patent. The Court shall separately discuss each of these grounds.

■ Defendants must prove anticipation by evidence which is strong, clear and convincing. *Smith v. Hall*, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049 (1936); *A. J. Industries, Inc. v. Dayton Steel Foundry Co.*, 394 F.2d 357, 361 (6th Cir. 1968). The nature of such burden was further defined by the Sixth Circuit Court of Appeals in *Dunlop Co., Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 412–13 (1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974), as follows:

In *National Latex Products Co. v. Sun Rubber Co.*, 274 F.2d 224 (6th Cir.) cert. denied 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 (1960), this court held that one claiming that a patent is void because it has been anticipated by prior art in the field carries a heavy burden and that proof of prior knowledge and use must be "clear and satisfactory." *Id.*, 274 F.2d at 231. The opinion emphasizes that prior art should be established by more than oral testimony and that reduction to practice is an essential if prior art is to be held to anticipate a patent. However, the case does not establish a requirement of *successful* testing as contended by *Dunlop*. The fact that a device has imperfections and encounters commercial problems does not disqualify it as anticipating prior art.

Thus defendants must establish anticipation by clear and convincing evidence.

■ A process patent can be anticipated only by a process which is similar or substantially the same. *Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 424, 22 S.Ct. 698, 46 L.Ed. 968 (1902). In other words, novelty does not exist where all the elements of the process patent or their equivalents are found in a single prior process, whether patented or not, which performs

substantially the same function in the same manner. *A. J. Industries, Inc. v. Dayton Steel Foundry Co., supra* at 359; *Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co.*, 332 F.2d 406 (6th Cir.), cert. denied, 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93 (1964); *Aluminum Company of America v. Sperry Products, Inc.*, 285 F.2d 911 (6th Cir. 1960), cert. denied, 368 U.S. 890, 82 S.Ct. 142, 7 L.Ed.2d 87 (1961). In other words, one prior art reference must fully anticipate all steps of the patent process:

> The standards of anticipation are strict. The invention must be disclosed within the four corners of a single reference. If a reference is silent or ambiguous with respect to an element or feature of the invention, that gap cannot be filled by an assumption or by combining one reference with another. An anticipating reference must teach the invention; it is not sufficient to point to its silence or ambiguity after the invention and argue that the invention could be made out from the reference.

*General Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 349 F.Supp. 345, 356, modified, 351 F.Supp. 872 (N.D.Ohio 1972), aff'd in pertinent part, rev'd in part, and vacated in part, 489 F.2d 1105 (6th Cir. 1973), cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), rehearing denied, 419 U.S. 886, 95 S.Ct. 160, 42 L.Ed.2d 131 (1974).

The entire prior art cannot separately supply each of the essential elements of the patent process. *Imhaeuser v. Buerk*, 101 U.S. 647, 660, 25 L.Ed. 945 (1880). Thus anticipation cannot be demonstrated by reference to one prior art patent for one feature of the patent process, and another prior art patent for another essential aspect thereof. See *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.*, 363 F.Supp. 1298 (E.D.Mich.1973), aff'd, 515 F.2d 534 (6th Cir. 1975).

In the instant action defendants assert that the process of the 267 patent was fully anticipated by United States Letters Patent No. 3,658,459 (hereinafter the 459 patent). Said patent was issued to John Gartlan on April 25, 1972, based upon an application filed March 6, 1968. The 459 patent is a pertinent prior art reference involving an adsorbent for purifying dry cleaning solvents. Essentially said patent discloses a process for removing objectionable color, odor, and other materials from cleaning solvent by the use of attapulgite clay in a solvent-permeable fibrous container. The 459 patent contains eight claims which read as follows:

**CLAIM 1**
In a method for removing objectionable color and odor bodies from a contaminated organic cleaning solvent used in drycleaning processes, the improvement which comprises continuously flowing said solvent through attapulgite maintained in a static, non-dispersed condition, said attapulgite having as its main components oxides of silicon, aluminum and magnesium and being high heat activated and low in volatile matter.

**CLAIM 2**
The process of claim 1 in which the attapulgite has the following specification: a $^{16}/_{30}$ (U.S. sieve number) particle size, and low volatile matter content.

**CLAIM 3**
The process of claim 1 in which the attapulgite is in a solvent-permeable container.

**CLAIM 4**
The process of claim 3 in which the container is a sack, and which comprises placing the sack into the solvent after about 400 pounds of soiled garments have been treated with said solvent.

**CLAIM 5**
The process of claim 4 in which the sack is removed from the solvent and another sack containing fresh attapulgite is placed in the solvent after about 400 pounds of soiled garments have been treated with said solvent.

**CLAIM 6**
The process of claim 4 in which the sack contains about 4 to 6 pounds of attapulgite.

**CLAIM 7**
The process of claim 6 in which the solvent is perchloroethylene.

*CLAIM 8*

In combination, dry-cleaning tank and a solvent-permeable sack containing attapulgite clay which has a $^{16}/_{30}$ (U.S. sieve number) particle size, a volatile matter content equivalent to 5 percent weight loss at 1,200° F. on a moisture-free basis, said attapulgite having as its main components oxides of silicon, aluminum and magnesium and being high heat activated and low in volatile matter.

As is readily apparent, an object of this invention was to provide a new adsorbent for the removal of soluble components from dry cleaning solvent, and a process employing such adsorbent which would increase the effectiveness of the solvent and eliminate the need for frequent distillation.

■ Although the 459 patent was a pertinent prior art reference, it was not considered by the Patent Office during the prosecution of the 267 patent. Where the Patent Office has not considered applicable and material prior art, the presumption of the patent's validity is weakened. *Bolkcom v. Carborundum Co.*, 523 F.2d 492, 498 (6th Cir. 1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1725, 48 L.Ed.2d 194 (1976), citing *Dunlop Co., Ltd. v. Kelsey-Hayes Co., supra* at 413; *Schnadig Corp. v. Gaines Manufacturing Co., Inc.*, 494 F.2d 383, 390 (6th Cir. 1974); *Monroe Auto Equipment Co. v. Heckethorn Manufacturing & Supply Co., supra* at 413. The degree by which the presumption is weakened, however, is dependent upon a balancing of the pertinence of the newly cited art with that of the art considered by the Patent Office. *Tee-Pak, Inc. v. St. Regis Paper Co.*, 491 F.2d 1193, 1196 (6th Cir. 1974). Therefore, unless the statutory presumption of validity has been completely destroyed, it is merely one relevant factor to be considered in a determination of validity. *Id.*

A comparison of the 459 patent with the 267 patent reveals a lack of substantial identity of the processes disclosed in each. The 459 patent discloses a process for purifying dry cleaning solvents. The heart of the invention appears to be the discovery of a new adsorbent for the removal of soluble contaminants from dry cleaning solvent, namely a certain type of attapulgite clay. The 459 patent also teaches a method or process of reconstituting the solvent through the use of such clay. Specifically, it provides a process whereby dirty solvent continuously flows through a solvent permeable sack containing attapulgite clay, which sack is hung in a dry cleaning tank.

Although the 267 patent also teaches a process of purifying dry cleaning fluid, it discloses essentially a three-step process. Said patent teaches the use of a pre-filtering device for the removal of larger solid particles, a primary filter composed of fluted paper filter for the removal of solid particles that passed through the pre-filter, and a clay filter-adsorber for the removal of soluble materials. The pre and primary filters are designed to permit the free and adequate flow of solvent through the attapulgite clay particles without premature clogging thereof. Further, unlike the sack utilized in the 459 patent, the process of the 267 patent provides for the flow of dirty fluid through a cartridge means containing the primary paper filter and a column of attapulgite clay particles.

Based on the foregoing, it is clear that the process and means of the 459 patent and that of the 267 patent are indeed different. Upon analysis thereof, the Court finds that all of the elements and steps of the 267 patent, and/or their equivalents, are not found in the disclosure of the 459 patent. The method of the 459 patent does not teach that of the 267 patent. Thus the Court must conclude that the 459 patent does not fully anticipate the 267 patent.

As stated above, defendants also contend that the 267 patent is invalid because the invention disclosed therein was in public use or on sale for more than one year prior to the application therefor. Since the patent application was filed on April 17, 1970, the critical date in determining prior use or sale is April 17, 1969.

■ Within the meaning of 35 U.S.C. § 102(b), public use has been defined as "any non-secret use of a completed and operative invention in its natural and in-

tended way." *FMC Corp. v. F. E. Myers & Bro. Co.*, 384 F.2d 4, 9 (6th Cir. 1967), cert. denied, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968), cited in *Atlas Chemical Industries, Inc. v. Moraine Products*, 509 F.2d 1, 3 (6th Cir. 1974); *Dunlop Co., Ltd. v. Kelsey-Hayes Co.*, 484 F.2d 407, 413 (6th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1414, 39 L.Ed.2d 471 (1974). Further, it is well established that a single public use or a mere placing on sale is sufficient to invalidate a patent. *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc.*, 409 F.2d 99, 100 (6th Cir. 1969), citing *Consolidated Fruit-Jar Co. v. Wright*, 94 U.S. 92, 24 L.Ed. 68 (1876); *Smith & Griggs Manufacturing Co. v. Sprague*, 123 U.S. 249, 8 S.Ct. 122, 31 L.Ed. 141 (1887), respectively.

■ The one year bar of § 102(b) is designed to prevent an inventor's profiting from his invention for a number of years before obtaining a patent at some later time. *Ushakoff v. United States*, 327 F.2d 669, 672, 164 Ct.Cl. 455 (1964), cited in *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc., supra*, at 100; *FMC Corp. v. F. E. Myers & Bro. Co., supra* at 9. An exception to said statutory bar, however, is recognized where the subject use "may be properly characterized as substantially for the purposes of experiment." *Smith & Griggs Manufacturing Co. v. Sprague, supra* at 256, 8 S.Ct. at 126. Thus the use of an invention by the inventor, or another at his direction, by way of experiment, and in order to perfect the invention has never been regarded as a public use within the meaning of the statute. *Id.* at 257, 8 S.Ct. at 122. In other words, a use involving public disclosure is nonetheless not a public use if solely a good faith test of the qualities of the invention. *Id.* However, where the inventor permits the use of his invention by others generally, with or without compensation, or consents to its being put on sale for such use, there is a public use or sale within the statutory proscription. *Id.* at 258, 8 S.Ct. at 122, quoting *Elizabeth v. Pavement Co.*, 97 U.S. 126, 135, 24 L.Ed. 1000 (1877).

■ The party asserting patent invalidity under § 102(b) must show a public use or sale prior to the period of limitation by clear and convincing evidence. *FMC Corp. v. F. E. Myers & Bro. Co., supra* at 10. Thus defendants herein have the burden of proving by clear and convincing evidence that the invention of the 267 patent was in public use or on sale before August 17, 1969. Where, however, there is a prima facie demonstration of prior use, the burden of proof shifts to the inventor in order to avoid application of the statutory bar. *Id.* Such burden was succinctly defined by the Court of Appeals for the Sixth Circuit in *Dunlop Co., Ltd. v. Kelsey-Hayes Co., supra* at 413:

> In *F. M. C. Corporation v. F. E. Myers & Bro. Co., supra*, we held that when an alleged infringer makes a prima facie demonstration of prior use, the inventor then has the burden of proving that this use "was not of a functionally operative device, or was substantially used for experimentation or testing purpose." 384 F.2d at 10.

This showing thereby required of the inventor must be by proof which is full, unequivocal, and convincing. *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc.*, 274 F.Supp. 993, 997 (E.D.Mich.1967), aff'd, 409 F.2d 99 (6th Cir. 1969).

■ In order to invalidate a patent, a public use or sale must involve the very invention patented. *Scharmer v. Carrollton Manufacturing Co.*, 525 F.2d 95, 100 (6th Cir. 1975). It is, of course, well settled that the claims of a patent, and not the specifications thereof, measure the invention. *Id.* at 101, citing *Milcor Steel Co. v. George A. Fuller Co.*, 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942). Thus an invalidating prior use or sale must embody all the elements and principles of the claimed invention. However, if it embodies substantially the principles and elements thereof, it is sufficient to invalidate the patent. *National Biscuit Co. v. Crown Baking Co.*, 105 F.2d 422, 427 (1st Cir. 1939). In other words, the use or sale need not be of the fully perfected invention for which the patent was

obtained. Rather, the use or sale must only be of a complete functional, and commercially operative invention which may nonetheless undergo further perfection or refinement. The applicable standard was set forth in *Atlas v. Eastern Air Lines, Inc.*, 311 F.2d 156, 162 (1st Cir. 1962), cert. denied, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963), and quoted with approval by the Sixth Circuit Court of Appeals in *Minnesota Mining & Manufacturing Co. v. Kent Industries, Inc., supra* at 101, as follows:

> [T]he rule is that an invention is deemed functional for public use purposes when it can perform the general function for which it has been developed, even though the device might later be refined. *Hall v. MacNeale*, 107 U.S. 90, 2 S.Ct. 73, 27 L.Ed. 367 (1882); *National Biscuit Co. v. Crown Baking Co.*, 105 F.2d 422 (1st Cir. 1939); *Monroe v. Bresee*, 239 F. 727 (7 Cir. 1917).

Therefore, if a prior sale or use embodies every element of the claimed invention and is capable of its essential operation, it invalidates the patent.

In the instant action, defendants contend that the process of the 267 patent was in public use or on sale prior to April 17, 1969. As found above, inventor Haase delivered several hundred dry cleaning filter cartridges embodying the patented process to the Barnes Drill Company in 1968. Barnes paid Haase for each of these clay-carbon dry cleaning cartridges. Further, in late 1967, Barnes Drill advertised its CSF dry cleaning unit utilizing these cartridges and sold the first such unit in December 1967. Said unit was installed in early 1968 and operated commercially for approximately six months. Additionally, in March 1968, Barnes Drill demonstrated and offered for sale its filtration unit with the Haase cartridges at a convention of dry cleaners in Detroit. Subsequently, approximately sixteen CSF dry cleaning units with clay-carbon cartridges were sold by Barnes.

Based on these findings, the Court must conclude that defendants have sufficiently demonstrated by clear and convincing evidence a prima facie case of prior public use and public sale. The cartridges offered for sale, sold, and commercially used in 1967–68 embodied all of the essential elements of the patented invention. Although plaintiffs contend that the cartridges contained 4/8 mesh size attapulgite clay, the Court found above that two of the cartridges sold to Jackson Cleaners contained finer granulations of clay, namely 8/16 mesh and 6/25 mesh clay. Moreover, even if some cartridges did in fact contain 4/8 mesh clay, such cartridges were nonetheless functionally operative, although not as efficient as those containing the finer granulations of clay. In other words, the public use and sale prior to 1969 involved substantially all of the elements and principles of the patented process although refinement thereof resulted in the patent claim of 6/25 mesh attapulgite clay. The process was complete and capable of performing its intended function, and was in fact utilized commercially in its natural and intended manner more than one year prior to the filing of the 267 patent application.

Defendants having made a prima facie case of prior public use and sale, the burden shifts to plaintiffs to rebut such case by showing either that such activity was part of a bona fide program of experimentation or that the process was not functionally operative. Plaintiffs herein assert that the cartridge sales to Barnes Drill were merely part of a testing program and did not involve the patented process. In other words, they contend that in 1967–68 the invention had not in fact been realized, but that such activity was merely part of on-going experimentation necessary thereto.

The Court finds, however, that plaintiffs have failed to show by even a preponderance of the evidence that the Barnes Drill venture was for the purpose of experimentation. On the contrary, Barnes Drill ran its own test of the cartridge prior to offering such for sale. Apparently convinced of the merits of the process, it undertook to advertise and sell the CSF dry cleaning unit and the Haase clay-carbon cartridge as an integral part thereof. As indicated by Barnes' officials, the venture was under-

taken with the intent of making a substantial profit; they clearly did not do so solely for the purpose of experimentation or testing. Indeed, the very nature and extent of their activity negatives any such finding. The fact that Barnes' sales of its dry cleaning units were on a consignment basis is not determinative. It appears that such is their regular business practice when introducing a new product to the industry. Further, the sales activity of Barnes was that of a third party with the apparent knowledge and consent of the inventor, but not under his control. Likewise, the process was used by others generally in the commercial dry cleaning industry with the apparent permission of the inventor, but not at his direction.

In view of the foregoing, the Court finds that there was a prior public use and sale of the process disclosed in the 267 patent more than one year prior to the application therefor. Thus, the Court must find that the 267 patent is invalid under § 102(b).

■ In accordance with what is usually better practice, the Court has fully inquired into the validity of the 267 patent insofar as the issues and evidence permit. See *Sinclair & Carroll Co., Inc. v. Interchemical Corp.,* 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945). The Court thus turns to the issue of infringement. Having found the 267 patent invalid, however, it is not necessary to determine said issue. *Minnesota Mining & Manufacturing Co. v. Norton Co.,* 280 F.Supp. 674, 694 (N.D.Ohio 1968), aff'd, 426 F.2d 1117 (6th Cir. 1970). Indeed, the Court is of the opinion that the infringement issue is moot in light of such finding; it is well settled that an invalid patent cannot be infringed. See 7 *Deller's Walker on Patents* § 588 (2nd ed.). Moreover, since certain issues raised in the pleadings relative to the patent's validity, including obviousness or lack of invention, have been reserved, the Court deems it inappropriate under the circumstances herein to fully consider the infringement issue.

Accordingly, the Court having found the 267 patent invalid under 35 U.S.C. § 102(b) as having been in public use or on sale more than one year prior to the application therefor, judgment shall be entered for defendants and against plaintiffs. Further, the Court specifically finds United States Letters Patent 3,733,267 to be invalid and unenforceable.