52 CCPA

**Kenneth H. WHITE, Appellant,**

v.

**Harold H. P. LEMMERMAN, Appellee.**
**Patent Appeal No. 7129.**

United States Court of Customs
and Patent Appeals.
Feb. 11, 1965.

Rich and Smith, JJ., dissented.

D. D. Allegretti, Bair, Freeman & Mo-
linare, Chicago, Ill. (Roger W. Jensen,
Minneapolis, Minn., of counsel), for ap-
pellant.

Irving M. Freedman, Utica, N. Y., for
appellee.

Before RICH, Acting Chief Judge,*
SMITH and ALMOND, Judges, and
Judge WILLIAM H. KIRKPATRICK**;
original argument before WORLEY,
Chief Judge, and RICH, MARTIN,
SMITH, and ALMOND, Judges.

ALMOND, Judge.

This appeal relates to an interference
proceeding involving a patent [1] granted
to Kenneth H. White as assignor to
Minneapolis-Honeywell Regulator Com-
pany, and an application [2] filed by Harold
H. P. Lemmerman and assigned to the
General Electric Company.

There are eight counts in issue which
are all of the claims of the White patent
copied by Lemmerman while his applica-
tion was under final rejection with no
claims allowed.

Counts 1 and 8 are representative and
read as follows:

"1. In a floated gyroscope: a
generally hollow cylindrical housing;
a generally hollow cylindrical cham-

---

* Worley, Chief Judge, did not sit in the
hearing of this case, but by agreement of
counsel, participated in the decision.

** United States District Judge for the
Eastern District of Pennsylvania, desig-
nated to participate in place of Judge
MARTIN, pursuant to provisions of Sec-
tion 294(d), Title 28, United States Code.

1. Serial No. 643,704 filed March 4, 1957,
now Pat. No. 2,900,823 granted August
25, 1959.

2. Serial No. 631,903 filed December 31,
1956.

ber in said housing; a gyroscope in said chamber; support means for rotatably supporting said chamber in said housing for rotation about an axis, said chamber having a normal position relative to said housing; a fluid in said housing and surrounding said chamber; and means for resisting relative rotation of said chamber and said housing about said axis comprising a plurality of vanes on said chamber extending generally parallel to said axis and outwardly from said chamber, toward said housing defining a plurality of restrictive gaps between said vanes on said chamber and said housing, and· a plurality of vanes on said housing extending generally parallel to said axis and inwardly from said housing toward said chamber defining a plurality of restrictive gaps between said vanes on said housing and said generally cylindrical chamber, said vanes on said housing and said chamber terminating with arcuate faces of substantial width."

"8. In an inertial instrument: a housing; a gimbal; means for rotatably supporting said gimbal on said housing for relative rotation therebetween about an axis; inertial means mounted on said gimbal; and means for resisting relative rotation of said gimbal and said housing about said axis comprising a plurality of vanes on said gimbal extending substantially radially from said gimbal toward said housing, a plurality of vanes on said housing extending substantially radially from said housing toward said gimbal, fluid means in contact with said vanes, and restrictive gap means, said vanes on said housing and said gimbal coacting together and with said fluid means to pump said fluid means through said restrictive gap means upon a relative rotation be-

tween said housing and said gimbal about said axis."

Each party took and filed testimony.

■ The question here is one of priority of invention with the burden of proof resting on the junior party, appellant White. The board found that appellant had conceded before the board that appellee Lemmerman, the senior party, was the first to conceive the invention in issue. Appellant must, if he is to prevail, establish an actual reduction to practice of the invention at least prior to the filing date of the appellee. The board considered only the evidence adduced on behalf of appellant and the arguments in the briefs relating to an actual reduction to practice "since a finding adverse to him would dispose of this case."

Appellant asserts that the invention in issue constitutes an improvement in floated inertial devices, such as floated gyroscopes, which were well known in the art long prior to the filing of either of the instant applications. A typical prior art floated gyro is shown in the patent to Jarosh et al.[3] A cylindrically shaped chamber or gimbal is supported inside a similarly shaped casing or housing. A gyroscope is mounted inside the gimbal. The housing is filled with a viscous damping fluid. This fluid surrounds the gimbal and is disposed in the annular damping gap. The fluid used has a density substantially identical to the density of the gyroscope gimbal resulting in the gimbal being supported in substantial neutral suspension, thus relieving the loading on the bearing means between the gimbal and the housing. The gimbal rotational axis is identified as the "output axis." The purpose of reducing the friction on the output axis is to eliminate the frictional errors normally present in gyroscopes. Another function of the fluid is to cushion the gyroscope against mechanical shocks. Still another function of the fluid is to serve as a damping means on the rotation of the gimbal and the housing about the

3. Pat. No. 2,752,791, filed February 9, 1951; issued July 3, 1956.

output axis. The damping of the prior art is known as "shear damping" which is produced by the shearing effect between the adjacent fluid molecules as they are moved relative to one another.

Jarosh states that the damping about the output axis causes "the gyro to act as an integrator and hence to tend to produce a rotation about the output axis which is proportional to the integral of the rate of deflection of the assembly about the input axis." Jarosh employed heating to keep the fluid at a constant temperature "so there will be no variation in the damping coefficient."

Honeywell, appellant's assignee, began manufacture and sale of gyroscopes of the Jarosh type in 1949, which included models identified of record as HIG–4's, HIG–5's and HIG–6's. The application of these gyroscopes was restricted by reason of the limitations on the amount of "total damping" which could be secured from the shearing action of the fluid in the annular gap. The record shows that appellant and the technicians at Honeywell were cognizant of this problem and the need for additional damping prior to the conception by appellant of the invention here involved. The testimony shows that the severity of these prior art limitations was more pronounced in very large gyros or small gyros with high speed rotors.

The specific problem which the invention in issue solved was to considerably increase total damping of a floated gyroscope. It was essential in such progress to maintain accuracy of the integration function of the gyroscope. In doing this, there could be no sacrifice of linearity of damping.

It is asserted that the solution of the problem by the invention in issue was accomplished through means described as "paddle damping." This comprises providing at least two paddles or vanes on the gimbal which extend toward the housing and at least two similar means attached to the housing which extend toward the gimbal. Upon relative rotation between the gimbal and the housing about the output axis, a pumping action on the fluid occurs which forces the fluid between relatively small restrictive gaps between the circumferential faces of the paddles and their coacting structure. It is claimed that a higher degree of total damping can be obtained through this structure, due to the pumping action, than could be obtained by the prior art shear damping.

The White patent herein involved states:

"One use of a floated gyroscope is to integrate angular rate of the gyro about its input axis (the input axis being defined as the axis perpendicular to both the gyro spin axis and the gyro output axis). The amount of angular displacement of the gimbal assembly about the output axis is a measure of the time integral of the angular rate of the gyroscope about the input axis and hence is a measure of the total angular displacement about the input axis.

"The integration is performed because the rotation of the gimbal about its output axis is opposed by a retarding torque developed by the action of the viscous fluid on the gimbal assembly. In order to have accuracy of integration it is necessary that the damping torque be a linear function of gimbal angular turning rate.

"The damping means of the present invention as described above will serve to provide a damping torque that is a linear function of the angular turning rate between the gimbal and the housing. The paddles produce a pumping action upon the viscous fluid."

Appellant's approach to establish actual reduction to practice of his invention was through a modification of a standard Honeywell HIG–6 production gyro of the prior art shear damping or annular gap type into the paddle damping configuration of his invention and to test this configuration to determine whether or not it could solve the problem stated with no sacrifice of linearity. As noted, the damping problem was more critical

in the larger gyro. This was the reason assigned for the selection for the damper comparison test of the HIG–6 gyro which was the largest and most advanced of the Honeywell production gyros in existence at that time and had a factor of higher angular momentum than the HIG–5.

The modified paddle damping gyro used for the comparison test with the HIG–6 is referred to as the "P.D.609." The witness Johnson testified that the HIG–6 was modified "by putting paddles on the gimbal which was made with a different size damping gap than the normal one and with a different main housing." In addition, a fluid of different viscosity was employed. That the "P.D. 609" was built at least prior to Lemmerman's filing date admits of no controversy. Thus the question before the board which we now review is whether proper testing occurred to establish reduction to practice.

■■ The board, in holding that the tests conducted by White prior to the filing of Lemmerman's patent application were insufficient to establish reduction to practice, relied upon Larsen v. Marzall, 90 U.S.App.D.C. 260, 195 F.2d 200 (1952) and Elmore v. Schmitt, 278 F.2d 510, 47 CCPA 958. In both cases it is pointed out that bench tests may be sufficient and that the amount of testing necessary depends upon the particular invention. The invention in Larsen was drilling mud and in Elmore it was a binary counter. The factual situations in both cases are so different from the one presented before us here that we find them of little actual help in deciding the present issue. The general rule indicated by Elmore is that tests must be such as to indicate that the invention worked as intended in practical use. This may be done in several ways. The invention may be tested under actual conditions of use, i. e., flight tests in this case. The invention may be given "bench tests" which fully duplicate each and every condition of actual use. Finally, in some cases, bench tests may be per-

formed which do not duplicate all of the conditions of actual use. In order to show reduction to practice based on such tests, the evidence must establish a relationship between the test conditions and the intended functional setting of the invention. Paivinen v. Sands, 339 F.2d 217, 52 CCPA ——. We must determine whether White's evidence has established that relationship. Lemmerman contends that the testing was insufficient to show this.

In commercializing a gyroscope, many characteristics are tested. For example, White's exhibit 25 refers to storage temperature tests that should be run. A progress report dated September 19, 1955, recites:

"The immersion test is the only LCA test passed by the HIG–6 to date * * *. Tests still to be run are: vibration, shock, high temperature, *low temperature*, altitude, and *life*." (Emphasis added.)

White, however, contends that the only significant question regarding the gyro was whether the increased damping could be achieved with no decrease in damping linearity. White maintains that there were no serious questions with regard to how well the paddle damped gyro would hold up in service because it was merely a modification of the commercial HIG–6. We feel that White's position is consistent with the record. Lemmerman would require all of the standard industry tests mentioned above, but he has not indicated why they are *necessary*. In the present case, with the information obtained in developing the earlier HIG–6 gyro to draw on, we agree with White that the only significant unresolved problem is that of linearity of damping. The problems raised by the fact that the paddle damped gyro employed a new damping fluid and operated by different principles of fluid mechanics than the HIG–6 are, we think, to a large extent just a part of the over-all problem of linearity. Thus, we must determine whether the testing was sufficient to indicate that damping would be "truly linear" under conditions of use.

With regard to testing for linearity, Lewis Winker, a Honeywell engineer, testified:

"Q 26. Can you tell me in general what the nature of the test was that you indicated it was ready for at the time of this memo, Exhibit No. 10? A. We wanted to test the gyro and see what the damping coefficient of the gyro was and if the damping coefficient was a linear characteristic of the gyro under *different rates of input* to the gyro." (Emphasis added.)

Winker's testimony continues that the test work was assigned to John Voissem, with whom he conferred regarding the testing; that he observed part of the testing "maybe a couple of hours"; that he could not recall exactly to what extent he discussed the testing with Voissem during the course of the test work "possibly three or four times * * * when he was evaluating the linearity of the gyro" and that Voissem reported the results to him giving him copies of the graphs from the results of the testing.

Prior to the Voissem tests Winker prepared a memorandum identified of record as Exhibit #10. This exhibit in pertinent part recited:

"In addition to determining gyro damping, a large part of the test work on this gyro will be expended in determining damping linearity at high and low input turning rates in comparison to present gyros."

Winker stated that the evaluation engineer tested both the P.D. 609 and the HIG–6 at various turning rates on a mechanical turntable and that he ran damping tests on a mechanical rate table; that he (Winker) observed some of these tests on the paddle damping gyro but did not watch the tests on the HIG–6.

Winker stated that he received the graphs (Exhibits 14 and 15) from Voissem on or about the dates appearing thereon, viz. March 29, 1956 and April 9, 1956, and that from the data reported thereon it could be determined that the damping coefficient was a linear function of the different turning rates put into the gyro and that "from memory" it was "about ten times as great as it would have been for the other gyro which we used to compare it to."

Rodney W. Johnson, an engineering technician with Honeywell identified the gyroscope P.D. 609 from the markings which he had put on it.

John J. Voissem, a senior production engineer with Honeywell, testified that his first duties with respect to gyros at Honeywell were in the Evaluation Department doing preshipment testing of gyros, of HIG–6's and special tests in response to design engineering test requests; that he kept a log book of the test work he performed. He referred to log book data of March 8, 1956 relating to gyro No. 609 stating that he ran some "Null East-Null West" checks to start checking or start calibrating the gyro and to check its repeatability and "also checked the stops" and that he believed he checked the transfer function also. He described data of March 9, 1956 as relating to balancing and running variable and unbalanced checks; data taken on unit 609, the paddle damper gyro, indicated that he was calibrating the gyro "against earth's rate, or essentially calibrating the servo and the gyro against earth's rate" so as to determine and measure the mass unbalance; that data recorded March 22, 1956 relating to the same gyro referred to where he started to determine the transfer function at various input rates and that these tests were run on a small HIG–4 or HIG–5 rate table. The witness identified a photograph as showing the rate table or one like the table used which he described as an old design or an old type of rate table "which would put out a constant rate and various gyros—mostly HIG–4's and HIG–5's were checked on it."

In describing the nature of the tests performed, Voissem stated:

"The test essentially consisted of mounting the gyro on a table at proper operating temperature and driving the table at the various rates

both clockwise and counterclockwise and measuring the null signal or the signal generator output signal and the time required to traverse a particular angle, and through calculations determining what the transfer and millivolts per milliradian were."

The witness referred to 609 and 662 HIG–6 data as having the purpose "To make a brief comparison of the two gyros, one being with the paddle damper and one a standard damping type gyro." He stated that the comparison indicated to him that "it looks like the standard gyro was a little bit more non linear, or at least not level * * * over the rate range, as was the paddle damper. It was linear but it wasn't level."

It is White's contention that the above summarized tests indicate that the gyro will exhibit linear damping under conditions of use. The board disagreed, stating "the record does not show that any one of the tests performed by Voissem duplicated the conditions which would normally be encountered in a practical application of the invention in issue." We note that no one testified that the Voissem tests indicated that the paddle damped gyro would exhibit linear damping under normal conditions of use. All that was said about the tests was that for the given turning rates on the old test table, the output was linear. The important question is, were the turning rates a proper test of linearity, i. e., was there a relationship between the turning rates and the intended functional setting? In answering this question the board referred to the testimony of Lower.

Jack W. Lower, in the employ of Honeywell, was design supervisor, section head of the floated gyro group and had worked on gyros from the first Honeywell floated gyro. Lower testified that in 1949 he assisted in building an experimental autopilot around a floated gyro. He tested these early Honeywell gyros by plugging them into the autopilot and "flew them in the company airplane." He stated that the problems encountered in these first flight tests involved damp-

ing; that the flight tests were only partially successful because damping was not under adequate control. In further pursuit of a resolution of the problem, he stated that without adequate damping control it would not have been possible

" * * * to pursue a number of the so-called strap-down auto pilot schemes, lagged rate autopilot schemes like we have been pursuing in the past. I speak specifically of items like the Vanguard, the vehicle we injected into orbit, and a succession of other orbital shots in the last and succeeding six or eight years."

With regard to the experimental paddle damped gyro, Lower testified:

"It is my recollection that we had made certain paper studies and experimental studies of configurations of paddle dampers prior to the building of this first gyro. However, the extreme dynamic range needed in the integrater action of this damper in the gyro we felt could not be exhibited and demonstrated except in a completed gyro. In fact, in addition to building the gyro we built a very special hydraulic test fixture which could exercise the gyro adequately in order to prove or disprove the true linearity of this paddle damper. The specifics of that were instead of having a sinusoidal-type of oscillating table which is conventional in most testing of this nature, we built a saw tooth type of oscillating table which would slowly take the table over to one side and then jerk it back, and it was displayed that a number of cycles repeated thusly could prove or disprove the linearity to a fine degree of instrumentation.

"Q 53. What if any action did you take based upon the results reported to you of the gyro constructed with the paddle damping feature? A. The incident of positive results in the gyro test results confirmed to me that the paddle damper did have a basic utility that

could not be proven totally up to this point. We were considering alternative solutions to the problem, and this solution at this point then became apparent as a very prominent and acceptable solution."

Lower stated that laminar flow was essential to the achievement of linearity in the paddle damped gyro. He testified that testing on the new rate table indicated that laminar flow existed and that the Reynolds number was consistent.

The testimony of Lower is convincing that the new rate table was an adequate test of the linearity of the paddle damped gyro. The date of these tests is not in the record, however, and they cannot be relied upon for reduction to practice. Lower's testimony is also convincing that "true linearity" was not established by the Voissem tests on the old rate table. Furthermore, there is nothing in the record to controvert Lower's testimony on this point. Mr. LaHue, a senior staff engineer, stated in a memo "that the proof of damping linearity is an exceedingly difficult thing to prove over the ranges that are required * * *." Mr. Voissem, the senior production engineer who made the tests, testified only that the paddle damped gyro was linear "over the rate range." Mr. Winker, when asked if he had drawn any conclusion from the first rate table tests, stated only that the "damping coefficient was a linear function of the different turning rates that were put into the gyro * *." No one has stated that the old turning rate gave a meaningful test.

As to the rate table itself, Voissem testified that "It is an old design, or an old type of rate table which would put out a constant rate and various gyros * * *—mostly HIG–4's and HIG–5's were checked on it." According to Frykman, a project supervisor, in comparing the HIG–6 to the HIG–4 and HIG–5, the HIG–6 "had a factor of higher angular momentum than the HIG–5. The higher the angular momentum, the more critical the damping problem * * *." In view of Frykman's testimony, it is questionable whether a rate table designed for HIG–4's and 5's would satisfactorily simulate the intended functional setting of the HIG–6.

 We reviewed the entire record but find no error in the board's holding that the Voissem testing was not sufficient to establish reduction to practice. The decision of the board is affirmed.

Affirmed.

SMITH, Judge (dissenting).

I regret having to dissent in this case, for I feel strongly that the majority opinion evidences a clear understanding and correct interpretation of the relevant legal principles. I wholeheartedly agree with the proposition that, for the purpose of establishing actual reduction to practice of an invention, bench tests may be sufficient and the amount and nature of testing required depends upon the particular invention. Likewise, I agree with the stated position of the majority that the "tests must be such as to indicate that the invention worked as intended in practical use," and that the "evidence must establish a relationship between the test conditions and the intended functional setting of the invention."

Thus, the point at which I am constrained to disagree with the majority opinion comes not at the determination of *what the law is*, but at the *application of that law* to the facts of this case.

The testimony of White and of Winker indicates that both were satisfied that the tests were successful, and that the invention would operate as they had hoped it would. Standing against this testimony are the statements of Lower, which the majority feels cast sufficient doubt upon the quality and nature of the tests as to negate the significance of the conclusions of White and Winker. I cannot agree. Appellant's burden in this case is one of proof by a preponderance of the evidence. And when Lower's testimony is properly weighed, along with the other evidence, I feel that appellant has nevertheless established his case by a preponderance.

Lower's statements regarding the adequacy of the tests are at best general, and at worst, exceedingly vague. Nowhere does he point out specific shortcomings on the basis of which it could be said there was a failure to establish "a relationship between the test conditions and the intended functional setting of the invention."

Since, in my opinion, the board improperly weighed the evidence on behalf of appellant, and since the board elected not to consider the evidence on behalf of appellee, I would remand the case for a determination of priority based on a consideration of all the evidence.

RICH, Judge (dissenting).

I join in Judge Smith's dissent to which I would add only the following thoughts.

In In re Hartop, 311 F.2d 249, 50 CCPA 780, 792, after reviewing a number "of the so-called reduction-to-practice cases decided by this court," we summarized our view of them as follows:

"In some of the cases, the court found actual reduction to practice had been established; in others, no actual reduction to practice was found. However, running through *all nine cases* cited is the same expressed or implied criterion, namely, how would one *skilled in the art* interpret the experiments or tests. If the court was convinced that *one skilled in the art* would accept a particular test or experiment as a 'possibility' or 'reasonable certainty' or 'probability' or that it was 'reasonably predictable' that a tested invention would operate as alleged or have the utility alleged, a reduction to practice was found; otherwise, the court found no reduction to practice."

I think White has shown all that the law, as this court has propounded it, requires.

I also feel that the majority has failed to appreciate the essential simplicity of the claimed invention and its relation to the prior art as a mere improvement thereon. Reading the record and observing the reactions of my colleagues to it and to appellee's brief has given me the feeling that appellee has succeeded in hiding this essential simplicity behind a great cloud of dust without anything specific upon which to rest his case.

In my view the evidence adequately establishes the only two things that had to be established: (1) that the paddles added to the *old* gyro structure would effectually *increase* damping; and (2) that the linearity of damping is not thereby sacrificed.