**GENERAL ELECTRIC COMPANY**

v.

**The UNITED STATES and Honeywell, Inc.**

No. 188–75.

United States Court of Claims.

June 17, 1981.

Ronald R. Snider, Washington, D. C., atty. of record, for plaintiff. Irving M. Freedman, Utica, N. Y., Ralph M. Savage, New Hartford, N. Y., Arthur E. Bahr and Snider, Sterne & Saidman, Washington, D. C., of counsel.

Steven Kreiss, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, for defendant. Vito J. DiPietro, Washington, D. C., of counsel.

John S. Munday, Minneapolis, Minn., for Honeywell, Inc., third party defendant. Andrew E. Taylor and Larson, Taylor & Hinds, Arlington, Va., of counsel.

Before COWEN, Senior Judge, and DAVIS, KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## OPINION

PER CURIAM:

This suit is brought by plaintiff, General Electric Company (GE), seeking reasonable and entire compensation for the alleged unauthorized use by or for the United States of the invention described in and covered by United States Patent No. 3,203,259 ('259 patent), under 28 U.S.C. § 1498(a) (1976), and for the unauthorized practice of the invention within the United States in connection with the furnishing of assistance to foreign governments under 22 U.S.C. § 2356(a) (1976).

United States Patent No. 3,203,259 (the "Lemmerman patent"), entitled "Viscous Damped Sensing Device," issued on August 31, 1965 in the name of Harold H. P. Lemmerman as the sole inventor, on an application filed December 31, 1956 (Serial No. 631,903). GE is, and has been since the issuance thereof, the assignee and sole owner of the Lemmerman patent.

GE alleged in its petition that the invention covered by the Lemmerman patent has been manufactured or used by or for the Government in connection with gyroscopes furnished by Honeywell, Inc. (Honeywell); Lear-Siegler, Inc. (Lear-Siegler); Kearfott Division of General Precision, Inc. (Kearfott); Nortronics Division of Northrop Corporation (Nortronics); and Giannini Controls Corporation (Giannini). At the trial, the respective gyros were identified as the GG–87 and GG–1111 (Honeywell) and the G1–T1, GR–H3 and GR–H4 (Nortronics) gyros. No evidence was introduced with respect to gyros manufactured by Lear-Siegler, Kearfott, or Giannini.

The Government filed its answer, denying infringement and validity. In addition, it asserted various affirmative defenses of unenforceability, including a claim of a license under the patent. By amendment to its answer the Government added a defense of invalidity on the ground that GE engaged in conduct which was inequitable and constituted a fraud on the Patent Office in procuring the patent. The Government also amplified its pleading with respect to the alleged sale or offering for sale of devices covered by the patent, by GE and others, more than a year prior to the date on which the application for patent was filed by GE.

Pursuant to Rule 41, Honeywell and Lear-Siegler were noticed to appear and assert any claim they had or may have had in the subject matter of the suit. Only Honeywell appeared and participated in the pretrial, trial, and post-trial proceedings. Honeywell filed a separate answer which incorporated the substance of each of the defenses relied upon by the Government.

The case was tried before former Trial Judge Francis C. Browne who issued a comprehensive opinion and findings dealing with every issue of the many pursued before him. He concluded that plaintiff is not entitled to recover and that the petition should be dismissed. Both GE and the Government excepted to some of the trial judge's holdings and the case has been argued before the court *en banc*.[1] We find that it is necessary and appropriate to reach and consider only one issue—whether the patent is invalid because of a prior sale by Control Engineering Corporation more than one year before the filing date of the '259 patent application—and therefore confine our consideration and discussion to that one dispositive question which Trial Judge Browne decided against plaintiff. On that issue we agree with the trial judge, hold that the patent is invalid on that basis, and that therefore plaintiff cannot recover, and accordingly we dismiss the petition.[2]

The Lemmerman patent in suit ('259 patent) is described by the Court of Customs and Patent Appeals in *White v. Lemmerman*, 341 F.2d 110, 110–12, 144 USPQ 409, 409–11 (C.C.P.A.1965) (a patent interference proceeding between two patent claimants). Defendant contends that the invention covered by each claim of the '259 patent was in public use or on sale by Control Engineering Corporation (CEC) prior to December 31, 1955 (more than 1 year

prior to the December 31, 1956 filing date of the '259 patent application). Accordingly, defendant contends that all claims in the patent are invalid under § 102(b) of the Patent Act.[3] We accept that argument (and therefore go no further).

The evidence establishes that in 1954, CEC began developing a rate gyro designated as the GR–J1. After a prototype was built and tested, its Chief Components Engineer Swainson asked one of CEC's design and development engineers, Koning, to prepare a detailed estimate of the cost of producing a limited production lot of 20 GR–J1 gyroscopes. Koning prepared an estimate and submitted a five-page memorandum, dated May 5, 1955, to Swainson, outlining in detail the estimated cost of each component and the time required to fabricate and install each component in a final assembly. Subsequently, CEC ordered the necessary parts and began production of a limited number of GR–J1 gyroscopes.

The first prototype GR–J1 models were constructed by skilled technicians from a sketch drawn by Koning in August 1954. CEC did not, however, go into production of large quantities of GR–J1 gyros on the basis of this sketch alone, since numerical scale dimensions of each gyro component were not given. A detailed set of shop or production drawings which showed this information was made later that year.

To establish the structural details of the GR–J1 gyro, defendant offered in evidence Koning's original sketch and the set of production drawings made later in 1954. Although plaintiff challenged the credibility of the production drawings, based on the fact that a few were dated after the critical date of December 31, 1955, unrebutted testimony clearly established that the draw-

---

1. Honeywell did not participate in the briefing or oral argument before the court, though it did file a short supplement in support of an ancillary motion. *See* n. 15, *infra.*

2. In our opinion on this issue we use a great deal of the trial judge's discussion of the question. We also adopt (without printing) the trial judge's findings numbered 1–20, 46–102 (substituting "1955" for "155" in finding 84). Any

factual statement in this opinion which may not be included within those findings also represents a finding of the court.

3. 35 U.S.C. § 102(b) (1976) provides that "[a] person shall be entitled to a patent unless—the invention was * * * in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, * * *."

ings were merely replacements of earlier drawings which had to be updated to reflect minor tolerance changes made during production. These changes did nothing to affect the applicability of the claims in suit to the structural features or operation of the GR–J1 gyros. Moreover, the later dated drawings were not indispensable to establishing the identity of the structural elements of the gyros.

The drawings and the unrebutted testimony of many witnesses, including that of Koning and Swainson (both of whom were intimately familiar with the GR–J1 gyro), clearly established that the GR–J1 had complementary rotor and stator vanes which cooperated with a low viscosity fluid to provide the required damping force. The correspondence between the GR–J1 and the invention recited in the '259 patent was so obvious that plaintiff conceded prior to trial that claims 1–7, 12, 13, and 15 read on the GR–J1 gyro. Accordingly, with respect to these claims, anticipation is conclusively established, provided the gyros were on sale or sold prior to December 31, 1955.

With respect to the remaining claims (8–11 and 14), however, plaintiff argues that they contain a specific limitation relating to the location of the rotor vanes not present in the GR–J1. In claims 8–11, plaintiff relies on the limitation that the rotor vanes are specified to be "extending generally parallel to said [rotation] axis and outwardly from said [rotor] chamber," and in claim 14 to be "extending substantially parallel to said [rotation] axis and radially from said [rotor] gimbal.[4]

The location of the GR–J1 rotor vanes differs from the location of the Lemmerman vanes as shown in the preferred embodiment of the patent. In particular, the rotor vanes protrude from the arcuate face (sides) of the rotor cylinder in the preferred embodiment of Lemmerman, while they protrude from the planar (end) face of the rotor cylinder in the GR–J1.

■ Although the vanes on the GR–J1 are on the end of the cylinder and the Lemmerman vanes are shown as being on the sides of the cylinder, claims 8–11 are not limited with respect to the location of the vanes except that the vanes are said to extend *generally parallel to the rotation axis* and *outwardly from the rotor chamber.* If one or more claims had been limited to a structure in which all the vanes extend radially from the *arcuate* surface of the cylindrical rotor chamber, the GR–J1 would not anticipate such claims. The question, however, is not what the patentee might have claimed, but what he has claimed. *E. g., Lewis v. Pennsylvania Steel Co.,* 59 F. 129, 131–32 (3d Cir. 1893). When the words of a claim are given their normal meaning, the court cannot, in order to sustain its validity, read into it elements or restrictions which are not set out therein. *E. g., Wm. B. Scaife & Sons Co. v. Falls City Woolen Mills,* 209 F. 210 (6th Cir. 1913). When interpreted in accordance with this principle, the claims of the Lemmerman patent, therefore, fail to distinguish the invention from the GR–J1.

■ With respect to claim 14, the GR–J1 rotor vanes do not extend "radially *from* said [rotor] *gimbal.*" (Emphasis supplied.) Although they do extend radially, they do so from *open space*, not *from the rotor gimbal.* It is well established, however, that exact identity between what was sold and what is claimed is not required, *e. g., Red Cross Manufacturing Corp. v. Toro Sales Co.,* 525 F.2d 1135, 1141, 188 USPQ 241, 245 (7th Cir. 1975). *See Timely Products Corp. v. Arron,* 523 F.2d 288, 302, 187 USPQ 257, 267 (2d Cir. 1975). In the present case the unrebutted testimony of expert witnesses established that the location of the rotor vanes on the arcuate surface of the rotor, as disclosed in the preferred embodiment of the Lemmerman patent, would have been obvious in 1956 in view of the placement of the vanes of the GR–J1 rotor on the planar (end) face of the rotor. They both operate in substantially the same way, for substantially the same purpose, to produce substantially the same result. The choice of one over the other is

4. A "gimbal" is deemed to be synonymous with "chamber" for the purposes of this suit.

merely a choice of design. Use of the GR–J1 vanes results in less rotational inertia (a desirable characteristic for quicker response), and provides a more slender gyro "package." Location of the vanes on the arcuate surface of the rotor, as shown in the preferred embodiment of the Lemmerman patent, merely produces a greater damping force per unit area of pumping surface and provides a shorter but larger diameter gyro "package."

If it is found that the GR–J1 model was "on sale," within the meaning of 35 U.S.C. § 102(b), more than a year prior to the filing of the Lemmerman patent application, all claims of the patent which read on the GR–J1 are invalid.[5]

The evidence established that, during the manufacture of the early production lot of GR–J1 gyros, CEC personnel visited a number of potential customers across the country in an effort to obtain orders for CEC's new GR–J1 gyro. As a result of this effort, CEC subsequently received orders from seven different companies for the purchase of one or more GR–J1 gyroscopes.[6] With the exception of one order which was cancelled prior to delivery, all orders were filled by delivery of GR–J1 gyroscopes prior to December 31, 1955, which period is·more than a year prior to the filing date of the Lemmerman application.

Sales of the GR–J1 gyro were established at trial primarily on the basis of two sets of business records which were authenticated and interpreted by Ms. Maguire, an employee of CEC who was the custodian and author of the records at the time of their preparation. The first set of records were captioned by customer name. For each customer, ·the date on which the order was taken was entered, along with the custom-er's address, a CEC assigned project identification and purchase order number, the quantity and model designation of what was ordered, and the dates upon which the devices were shipped. The second set of business records contained the same information (except for dates), captioned by CEC's project number. These records confirmed the accuracy and authenticity of the first set of records. Finally, many of the sales were corroborated by the testimony of three witnesses, Swainson, Koning, and Jones (CEC's then-president), who participated in the marketing effort.

For each completed sale, CEC made about a 20–25 percent profit over the cost of components and assembly labor. Thus, it is evident that the items were not experimental or undeveloped devices. They were priced for sale and sold in a competitive market.

Although plaintiff did not offer any contrary evidence at trial tending to rebut the evidence of the GR–J1 sales, it has challenged the credibility of defendant's witnesses and evidence and contends that neither is of sufficient weight or credibility to sustain defendant's burden of proof. In particular, plaintiff contends that some of the deliveries were on a consignment basis and, therefore, were not sales. However, not all of the orders were filled on a consignment basis. Since some were actually sold, the bar is created, since it is well established that even a *single* sale is sufficient to invalidate a patent under § 102(b) of the Patent Act, *see, e. g., Tool Research & Engineering Corp. v. Honcor Corp.,* 367 F.2d 449, 453, 151 USPQ 236, 241 (9th Cir. 1966), *cert. denied,* 387 U.S. 919, 87 S.Ct. 2032, 18 L.Ed.2d 972 (1967). Moreover, the mere fact that a sale is made conditional

---

5. Plaintiff has urged that the vanes of the GR–J1 are not of "substantial width" as required by claims 8 and 12. Aside from everything else, this point is wholly without substantive merit. There is nothing in the prior art, the patent specification, or the prosecution history of the Lemmerman application which requires the words "substantial width" to be so limited in interpretation as to exclude vanes of the width of those found in the GR–J1 gyro.

6. In the gyroscope market, potential customers rarely purchase production quantities of new gyros without testing the gyros to insure not only that they meet the specifications of the manufacturer, but also that they satisfy their own particular requirements, as well. Accordingly, the first sales of GR–J1 gyroscopes were viewed by CEC as an effort to obtain orders for larger quantities in the future.

upon the subjective satisfaction of the buyer or that the item is shipped on a consignment basis, does not automatically remove the transaction from either a sale or "on sale" within the meaning of section 102(b). *See Henry v. Francestown Soap-Stone Co.,* 2 F. 78 (1st Cir. 1880); *Taussig v. Jack & Jill One Hour Cleaners, No. 12, Inc.,* 462 F.Supp. 1026, 1040, 200 USPQ 579, 591 (N.D.Ohio 1978), *aff'd without opinion,* 633 F.2d 215 (6th Cir. 1980).

GE attacks the credibility of CEC's business records by pointing to a purported inconsistency in the evidence used to establish the meaning of a line which is drawn through some of the entries in the second set of records (those captioned by CEC project number). In particular, GE notes that while Ms. Maguire testified that such crossouts meant that the project was "complete, shipped, billed, money received from customer and so forth," the business record itself states that "sales order lined out indicate folder [7] has been disposed of." Accordingly, plaintiff contends that for those entries which are not crossed out there is an ambiguity as to whether the sale was ever completed. Each entry, however, contained an entry date prior to December 31, 1955, under a column marked "shipped/cptd [meaning completed]." Accordingly, this highly specific evidence removes, the trial judge properly found, whatever doubt there may have been as to the status of those sales transactions.

■ Even assuming, *arguendo,* that no sale of a GR–J1 was ever completed, it is well established that a *mere offer for sale* is sufficient to constitute a bar to patentability under 35 U.S.C. § 102(b). *See, e. g., Chromalloy American Corp. v. Alloy Surfaces Co.,* 339 F.Supp. 859, 869, 173 USPQ

295, 302 (D.Del.1972). CEC's business records clearly establish that there were numerous offers for sale over and above those instances where sales were actually made. Evidence of either a single sale or a single offer to sell is sufficient to invalidate a patent under § 102(b) of the Patent Act. *See Tool Research & Engineering Corp. v. Hancor Corp., supra.* In this case, CEC's business records, considered in light of the substantial corroborative oral testimony of four competent witnesses, constitute clear and convincing evidence that the GR–J1 gyros were on sale and actually sold prior to December 31, 1955.

■ In a further effort to fend off the sale and "on sale" bar, GE contends that the evidence is ineffective to invalidate the patent under § 102(b) because the GR–J1 was not "reduced to practice" prior to the time the first GR–J1 was sold. Reduction to practice, plaintiff argues, is a "basic legal requirement" in order for a sale to invalidate a patent under the Patent Act.[8] Defendant, on the other hand, maintains that it is totally irrelevant whether the invention was reduced to practice prior to sale of the device where, as here the seller was one other than the inventor or one under the inventor's control. Moreover, defendant strongly disagrees with plaintiff's fundamental assertion that the GR–J1 was not reduced to practice prior to the time it was sold by CEC.

To support its position that proof of reduction to practice is not a prerequisite where the sale was by one other than the inventor or one under his control, defendant relies upon *Bourne v. Jones,* 114 F.Supp. 413, 98 USPQ 206 (S.D.Fla.1951), *aff'd by adoption,* 207 F.2d 173, 98 USPQ 205 (5th

---

7. The word "folder" as used in this quotation refers to a set of invoice papers which document the progress of each project number. These folders form a third set of CEC records which corroborate the circumstances surrounding each sales transaction. Defendant's counsel informed the court that he was unable to locate any of the folders concerning any of the subject sales transactions. The trial judge found, however, and we concur, that the folders are unnecessary as the other documentary evidence, being records kept in the regular order of business, are sufficiently clear to establish that the GR–J1 was actually sold to several companies prior to December 31, 1955.

8. An invention which has been "reduced to practice" is an invention which has been sufficiently tested to demonstrate that it will work for its intended purpose. *E. g., Eastern Rotorcraft Corp. v. United States,* 181 Ct.Cl. 299, 384 F.2d 429, 155 USPQ 729 (1967).

Cir.), *cert. denied*, 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953); *Magnetics, Inc. v. Arnold Engineering Co.*, 438 F.2d 72, 168 USPQ 392 (7th Cir. 1971); and *Atlas Chemical Industries, Inc. v. Moraine Products, Inc.*, 350 F.Supp. 353, 175 USPQ 693 (E.D. Mich.1972), *modified*, 509 F.2d 1, 184 USPQ 281 (6th Cir. 1974). While there are dicta in these cases which lend substantial support to defendant's position, there are dicta in other cases which support the contrary position, *see Besly-Welles Corp. v. Balax, Inc.*, 291 F.Supp. 328, 335–36, 160 USPQ 265, 270 (E.D.Wisc.1968), *modified on other grounds sub nom. Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 164 USPQ 485 (7th Cir. 1970), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Kraft Foods Co. v. Walther Dairy Products*, 118 F.Supp. 1, 100 USPQ 215 (W.D.Wisc.1954), *aff'd*, 234 F.2d 279, 110 USPQ 3 (7th Cir.), *cert. denied*, 352 U.S. 926, 77 S.Ct. 223, 1 L.Ed.2d 161 (1956). Although a study of the last-cited cases reveals some differences among their basic core facts, it is doubtful that legal significance can rationally be accorded to any of these differences. Thus, there seems to be a conflict among the few authorities which have touched on this question, and there is as yet no controlling authority.[9]

██ Legislative history and case law reveal four identifiable policies underlying the "on sale" bar. *See* Barrett, *New Guidelines for Applying the On Sale Bar to Patentability*, 24 Stanford L.R. 730, 732–35 (1972). First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity. *See* S.Rep.No. 876, 76th Cong., 1st Sess. 1–2 (1939); H.R.

Rep.No.961, 76th Cong., 1st Sess. 1–2 (1939). Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention rights due to prior sales. *See Gould, Inc. v. United States*, 217 Ct.Cl. ——, 579 F.2d 571, 580, 198 USPQ 156, 164 (1978). A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17-year period. *Id.* The "on sale" bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection. *See* Barrett, *supra*, at 734. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment. *See Gould, Inc. v. United States, supra.* This benefits the public because it tends to minimize the filing of inventions of only marginal public interest. The 1-year grace period provided for by Congress in § 102(b) represents a balance between these competing interests.

██ Where the sale is by one other than the inventor (one not under the inventor's control), it would seem that the policy against extended commercial exploitation and the policy favoring the filing of only worthwhile inventions could be said not to apply. Nevertheless, it is well established that a placing of the invention "on sale" by an unrelated third party more than 1 year prior to the filing of an application for patent by another has the effect under

---

**9.** Although plaintiff has urged that its view of the law is mandated by *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 21 L.Ed. 821 (1873); *Gould, Inc. v. United States*, 217 Ct.Cl. ——, 579 F.2d 571, 198 USPQ 156 (1978); *International Glass Co., Inc. v. United States*, 187 Ct.Cl. 376, 408 F.2d 395, 161 USPQ 116 (1969); *Connecticut Valley Enterprises, Inc. v. United States*, 172 Ct.Cl. 468, 348 F.2d 949, 146 USPQ 404 (1965); and *Badowski v. United States*, 143 Ct.Cl. 23, 164 F.Supp. 252, 118 USPQ 358 (1958), we find each of these cases to be of little, if any, relevance to the precise issue under consideration.

In fact, with the exception of *Gould*, not one of these cases even involved an "on sale" bar, or for that matter, § 102(b) of the Patent Act in this respect. With respect to *Gould*, the sales were made by the patentee, not by an unrelated third party. Moreover, reduction to practice was not even at issue in *Gould* as both parties had conceded that the patented invention was reduced to practice prior to any of the sales under consideration. The issue in *Gould* was whether or not continued experimentation after reduction to practice tolled the relevant statute.

§ 102(b) of invalidating a patent directed to that invention. *See, e. g., CTS Corp. v. Piher International Corp.,* 527 F.2d 95, 102, 188 USPQ 419, 425 (7th Cir. 1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976). Accordingly, Congress should be held to have concluded, at the least, that the policy against removing inventions from the public domain and the policy favoring early patent filing are of sufficient importance in and of themselves to invalidate a patent where the invention is sold by one other than the inventor or one under his control.[10]

The evidence clearly established that CEC was not operating under the control of the inventor of the subject patent (Lemmerman), nor was it in any way connected with him. Therefore, if an exception to the third party "on sale" bar is to be made here because (it is claimed) the GR–J1 gyro was not reduced to practice prior to sale of the gyros, the exception must at the very least not frustrate the two policies apparently underlying the third party "on sale" bar.[11] Otherwise, an impermissible construction of

the statute would result. *See F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968).

Trial Judge Browne held that it would frustrate both the third and fourth policies underlying the "on sale" bar (the only policies he thought applicable) to apply the reduction-to-practice requirement to the third party sales here.[12] We need not decide whether or not he was correct in so ruling because he also found that, in any event, there was in fact a sufficient reduction-to-practice—and we agree with that conclusion.

Reduction to practice is, as we have previously mentioned, the stage in invention development when the invention has been reduced to a sufficiently tangible form to demonstrate that it will work for its intended purpose. *See, e. g., Eastern Rotorcraft Corp. v. United States,* 181 Ct.Cl. 299, 384 F.2d 429, 155 USPQ 729 (1967), and cases cited. Plaintiff, relying primarily upon *CTS Corp. v. Piher International Corp., supra,* 527 F.2d 95, 188 USPQ 419, contends

---

**10.** A few courts have stated that one purpose of the third party "on sale" bar is to preclude one "who is not actually the inventor" from obtaining a patent. *E. g., CTS Corp. v. Piher International Corp.,* 527 F.2d 95, 102, 188 USPQ 419, 425 (7th Cir. 1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976). However, this asserted purpose is achieved, not by section 102(b), but by section 102(g) and even more directly by section 102(f). Accordingly, it is unlikely that the principal purpose of the third party "on sale" bar is to prevent issuance of a patent to one "who is not actually the inventor."

**11.** It is sometimes said that the purpose of permitting proof of no reduction to practice to serve as an exception to the "on sale" bar is to give *the inventor* sufficient time to perfect his invention so that the patent ultimately filed will contain the most beneficial embodiment of the invention. *See, e. g., In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277–78, 183 USPQ 65, 69 (5th Cir.), *cert. denied,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). Where the sale is by an unrelated third party, however, this benefit will rarely result from such an exception. Accordingly, it is for this reason that some courts have concluded that this exception can never apply in third party "on sale" bar cases. *See Bourne v. Jones,* 114 F.Supp. 413, 98 USPQ 206 (S.D.Fla.1951), *aff'd by adoption,* 207 F.2d 173, 98 USPQ 205 (5th

Cir.), *cert. denied,* 346 U.S. 897, 74 S.Ct. 220, 98 L.Ed. 398 (1953); *Magnetics, Inc. v. Arnold Engineering Co.,* 438 F.2d 72, 168 USPQ 392 (7th Cir. 1971); *Atlas Chemical Industries, Inc. v. Moraine Products, Inc.,* 350 F.Supp. 353, 175 USPQ 693 (E.D.Mich.1972), *modified,* 509 F.2d 1, 184 USPQ 281 (6th Cir. 1974). *Contra, Besly-Welles Corp. v. Balax, Inc.,* 291 F.Supp. 328, 160 USPQ 265 (E.D.Wisc.1968), *modified on other grounds sub nom. Bendix Corp. v. Balax, Inc.,* 421 F.2d 809, 164 USPQ 485 (7th Cir. 1970), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Kraft Foods Co. v. Walther Dairy Products,* 118 F.Supp. 1, 100 USPQ 215 (W.D.Wisc.1954), *aff'd,* 234 F.2d 279, 110 USPQ 3 (7th Cir.), *cert. denied,* 352 U.S. 926, 77 S.Ct. 223, 1 L.Ed.2d 161 (1956). There is doubt, however, whether this particular policy applies to third-party sales.

**12.** He felt that (a) the policy favoring early patent filing would be totally unaffected by proof that there was no reduction to practice by the third party, and (b) the policy against depriving the public of inventions given to them through prolonged sales activity was satisfied here (regardless of reduction-to-practice) by CEC's actual delivery of gyros under the representation that they were completely operational devices (and without any suggestion that they were still in the experimental stage).

that the burden of proving a reduction to practice incident to proving that the invention was "on sale," lies with the defendant. Defendant, on the other hand, maintains that the burden lies with the plaintiff, citing (among others) *Dart Industries, Inc. v. E. I. DuPont De Nemours and Co.*, 489 F.2d 1359, 179 USPQ 392 (7th Cir. 1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974), and *In re Yarn Processing Validity Litigation*, 498 F.2d 271, 183 USPQ 65 (5th Cir.), *cert. denied*, 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). The decisions of these cases are not, however, inconsistent; the court placed the burden of proof on the party asserting the allegedly invalidating "on sale" bar activity (in *CTS Corp.* the sales were made by defendant, the accused infringer, while in *Yarn Processing* and *Dart Industries* they were made by plaintiffs, the patent owners). This seems logical since the party who is uniquely knowledgeable about the facts surrounding the development of the alleged anticipatory device should be in a position to prove those facts. *See Campbell v. United States*, 365 U.S. 85, 96, 81 S.Ct. 421, 427, 5 L.Ed.2d 428 (1961).

In the present case, however, it is not possible to allocate the burden of proof based on a test of superior knowledge, since neither plaintiff nor defendant was involved with the development or testing of the GR–J1 gyro. Thus, in determining the proper placement of the burden of proof, the decisions in these cases are not squarely applicable. Since we have been unable to locate any authority directly in point, placement of burden of proof will be based primarily on public policy grounds, *see Old Ben Coal Corp. v. Interior Board of Mine Operations Appeals*, 523 F.2d 25, 34–36 (7th Cir. 1975), and *Denning Warehouse Co. v. Widener*, 172 F.2d 910, 913 (10th Cir. 1949). We conclude (with the trial judge) that if the two previously mentioned public policy grounds for upholding the third party "on sale" bar are not sufficient under the facts of this case to render proof of technical reduction to practice irrelevant, they are at least of sufficient importance to place the burden of such proof on defendant, the

party asserting the fact of prior sales. We think, as did the trial judge, that that burden was sustained.

CEC did everything it could to persuade its customers that the GR–J1 was fully operational and the most technically advanced gyro on the market. All of CEC's actions showed that it considered the gyro ready for commercial sale and use—and not experimental or restricted in use. Although some of CEC's customers did test the gyros which they purchased, these tests were primarily aimed at determining whether the gyros would be well suited to their *particular* application, not whether the gyros were a functional device. Moreover, none of these tests were made at the request of CEC nor were their results ever reported back to CEC. Under such circumstances, the potential for detrimental public reliance was fully present. The statute requires no more. *Cf. Roller Bearing Co. of America v. Bearing, Inc.*, 322 F.Supp. 703, 707–08, 168 USPQ 648, 651–52 (E.D.Pa. 1971) (whether the purchaser intends to further subject product to testing is not *the* standard for determining experimental use). Some gyros were repurchased and Schoepple, an ex-manager of Lear-Siegler's Flight Reference Engineering Section, testified that Lear-Siegler tested the GR–J1 gyro and that it showed itself to be a "darn good gyro". The gyros were in fact fully operational. The evidence shows that each gyro was tested prior to shipment and that no complaints were ever received from any customers to whom the GR–J1 gyros were sold. The record thus reveals that CEC's so-called "paddle-damping" gyro—on which, as we have said, the Lemmerman claims read—was adequately reduced to practice prior to CEC's pre-December 31, 1955 sales and offers-to-sell. The device was plainly shown to be operable and useable commercially at least in non-combat conditions, which is enough for our purposes because the Lemmerman claims do not recite a specific use and that invention, as claimed, may be used in non-military and non-combat systems.

For this reason, it makes no difference to proof of CEC's reduction-to-practice that its product may not have been subjected to the special environmental, shock, and vibration tests plaintiff says would be necessary for full military or combat use. Those would relate to the customer's (*e. g.* the United States') intended use, not the invention's operability. *See White v. Lemmerman, supra,* 341 F.2d at 113. As for tests for damping linearity (which GE insists are essential for a reduction-to-practice), we think that, in view of CEC's presale testing, the actual sales, and the customers' testing and reactions, a special test for damping linearity was not necessary (in this situation of a third-party sale) to show operability for the function for which that gyro and the '259 patent were intended.[13]

For these reasons, the '259 patent is invalid, under Section 102(b), because the invention was on sale and in public use in this country more than one year prior to the application date of the patent (December 31, 1956). There can be no recovery under 28 U.S.C. § 1498(a).[14]

## CONCLUSION OF LAW

On those of the trial judge's findings which are adopted by the court and on the foregoing opinion, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.[15]

---

**13.** In this connection, it is to be noted that CEC did perform tests on the wobbler which tended to show damping linearity (even if it might not be a special full-scale test).

**14.** Although GE initially sought relief under 22 U.S.C. § 2356(a), no evidence surviving the invalidity of the Lemmerman patent was offered in support of this claim. Accordingly, Count II of the petition must also be dismissed.

**15.** In view of the grounds of our disposition, we deny (a) defendant's motion to strike certain of plaintiff's exceptions to the trial judge's findings, (b) defendant's motion for production of certain documents and supplementation of the record, as well as third-party defendant Honeywell's motion in supplement of defendant's motion, and (c) plaintiffs alternative motion for supplementation of the record and offer to provide privileged documents.